### In the Interest of Baby Girl RODRIGUEZ, a Minor Child.

#### No. 04–96–00280–CV.

Court of Appeals of Texas, San Antonio.

Jan. 31, 1997.

Rehearing Overruled Feb. 26, 1997.

John R. Brumbelow, Tyler, for appellant.

Mark M. Ferguson, Kevin M. Warburton, Gardner & Ferguson, Inc., San Antonio, for appellee.

Before DUNCAN, ANGELINI and CARR [1], JJ.

DUNCAN, Justice.

In this difficult case of first impression, Mark Humberson appeals the trial court's judgment awarding managing conservatorship of his child, Madison, to Matt and Mindy Walsh, Madison's caretakers since birth. While we agree with Mark and the trial judge that there is no evidence that any act or omission, behavior, or conduct by Mark will impair Madison, *see Lewelling v. Lewelling*, 796 S.W.2d 164, 168 (Tex.1990), we agree

---

1. Assigned to this case by the Chief Justice of the Supreme Court of Texas pursuant to Tex. Gov't CODE ANN. § 75.003(a) (Vernon Supp.1996).

with the trial judge that "Madison's case is unique and distinguishable from authorities cited by counsel." We therefore hold that the *Lewelling* standard does not apply in this case, and the only standard that does apply is that mandated by the Texas Legislature in section 153.131(a) of the Texas Family Code: whether the appointment of Mark as Madison's managing conservator is not in her best interest because it will significantly impair her physical health or emotional development. When the legislative standard is employed, as it was in the trial court, the evidence is plainly sufficient to support the jury's implied finding of impairment. We therefore affirm the trial court's judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

On May 9, 1994, twenty-year-old Aracely "Sally" Rodriguez called Abrazo Adoption Services to learn about the adoption process. In response, Elizabeth Wanderwerf, Abrazo's executive director and the counselor who took Sally's call, sent Sally a packet of information. More phone calls followed, and Wanderwerf learned that Sally was concerned that her family would find out that she was, for a second time, single and pregnant. In June, Sally moved to San Antonio, where Abrazo was located, and began biweekly counseling with Wanderwerf. During the counseling process, Wanderwerf learned that Sally was sensitive to the difficulties of being a single parent since she was trying to fill that role with her daughter, Brittany, and, as a result, insisted upon an open adoption of her baby by a two-parent family. Sally also preferred an out-of-state couple. Sally ultimately chose Matt and Mindy Walsh of Charlotte, North Carolina to be her baby's adoptive parents. The Walshes accepted this privilege and responsibility enthusiastically and, throughout the summer, supported Sally emotionally and financially.

Also during that summer, Mark Humberson heard from Sally's niece that Sally was pregnant. Mark had dated Sally from approximately June or July 1993 until January 1994, when he was twenty-seven and she was twenty, but he had had virtually no contact with her after that point. As best Mark could recall, when he had last talked with Sally, she had told him she was moving to San Antonio to go to school. However, when Mark called to find out if Sally was pregnant by him, she denied it. At that time, and later in three affidavits of status, Sally named Juan F. Quintero as the father or probable father of her baby. On July 19, Quintero signed an affidavit of waiver of interest.

Sally's baby girl was born September 16, 1994. Matt and Mindy Walsh attended the birth and, together with Sally, named the baby Madison. On September 17, after Sally signed an affidavit relinquishing her parental rights and naming Abrazo as Madison's managing conservator and guardian ad litem, Madison was released to the Walshes, who returned to North Carolina. Sally returned to Tyler.

On September 23, Abrazo commenced this action by filing an original petition to terminate the parent-child relationship between Sally and Madison. The petition was supported by Sally's affidavit of relinquishment and affidavit of status, which again named Quintero as the baby's father or probable father, and Quintero's affidavit of waiver of interest. On September 30, the trial court entered a decree terminating the parent-child relationship between Madison and Sally and terminating any rights Quintero may have had.

In October, Sally told Mark that she had had a baby girl, he was the father, and she had placed the child in an open adoption. Thereafter, in an October 26 telephone conversation, Sally and Mark informed Abrazo that Mark was Madison's biological father. Based upon this information, Abrazo sent Sally another affidavit of status. By this time, Mark had hired an attorney, and it was in this attorney's office, on November 1, 1994, that Sally signed a fourth affidavit of status. This time Sally named Mark as Madison's father.

In a letter dated November 8, Mark's attorney notified Abrazo that Mark was "wishing to get his child." Abrazo referred him to its attorney. Sometime thereafter, in a telephone call and in a letter dated November 22, a different attorney notified Abrazo that he represented Mark and that Mark planned

to intervene in this proceeding to establish paternity. Abrazo again referred the attorney to its attorney. Finally, on December 9, Mark formally intervened in this proceeding, seeking to establish himself, through blood testing, as Madison's father and also to be named her managing conservator.

Upon learning that Sally had named Mark as Madison's father, the Walshes attempted to contact him. Mark did not, however, return the Walshes' telephone calls. According to Mark's mother, Cheryl Nix, Mark did not want to talk to the Walshes because he did not know what to say. On December 27, the Walshes intervened in this proceeding, also requesting blood testing—a request reiterated by Abrazo on December 30. Ultimately, in a report dated February 14, 1995, the University of North Texas Health Science Center at Fort Worth concluded that Mark was Madison's probable father by a factor of 99.98%.

On June 5, after an evidentiary hearing, the trial court found that Mark was Madison's biological father, named him as her temporary possessory conservator, and ordered two visitations, a short one in North Carolina and a longer one in Texas. The trial court also ordered Mark to pay child support and to provide health insurance for Madison. At trial, Mark testified that, while he had paid the ordered child support, he had not provided the ordered health insurance.

The Walshes did not meet or speak with Mark until June 1995, when he and his mother arrived in Charlotte, North Carolina for their first visitation with Madison. Following this visit, Mrs. Nix bought and addressed several cards to send to Madison; Mark signed these cards, and his mother mailed them. Mrs. Nix also bought and sent presents to Madison, made out the child support checks for Mark's signature, and initiated telephone calls to the Walshes to inquire about Madison. The second, longer visitation occurred in August 1995 in Tyler, Texas. Although the June 5 order required Mark to travel with Madison from Charlotte to Tyler, he failed to appear in Charlotte on the designated date. Ultimately, Matt Walsh brought Madison to Texas for the court-ordered visitation.

On September 5, 1995, the case was tried to a jury, which heard not only the facts outlined above but also the testimony of the Walshes regarding the impact on Madison of the two court-ordered visitations; the testimony of the parties' experts regarding whether Madison's physical health or emotional development would be significantly impaired if Mark were named her managing conservator, see TEX. FAM.CODE ANN. § 153.131(a) (Vernon 1996); and the results of the social study performed on Mark and his family.

Matt, who had taken child psychology courses in college, testified that he believed that an interruption of the bonding that had taken place between Madison, his wife, and him would injure Madison. According to Mindy, for about two weeks after Madison returned from her first visit with Mark, she refused to go through their well-established nighttime ritual of first reading certain stories and then singing certain songs before Madison would get in her crib. Instead, so long as she was awake, nine-month-old Madison refused to get in her crib; she seemed afraid to go to sleep and would wake up in the middle of the night crying and screaming. When Mindy would pick her up, Madison would not let go. Within a month, Madison was back to normal and would not cry if the Walshes left the room. When Madison arrived home from the second visit, she again refused to go through their established bedtime ritual, instead avoiding sleep and crying if the Walshes left the room. To Mindy, it appeared that Madison had reverted and needed the comfort of a bottle to fall asleep. So Madison was given a bottle and permitted to sleep with the Walshes.

The first expert witness to testify on the impairment issue was Elizabeth Wanderwerf, a licensed professional counselor and Abrazo's executive director. According to Wanderwerf, naming Mark as Madison's managing conservator "would be devastating to [Madison]." She also related to the jury that some theorists liken such a separation "to dousing a child with oil and setting them on fire. That the wounds are incredibly painful,

the recovery process is long and hard, and that the scars that are left, although not fatal, are permanent."

Dr. Jack G. Ferrell, a clinical psychologist with twenty years of experience and a specialist in family matters, also testified. According to Dr. Ferrell, the first three years of a child's life are a critical period—the period in which a child learns to love and to trust, the period in which a child develops a sense of her own identity and self-esteem. Indeed, Dr. Ferrell testified, as a member of several Family Code revision committees, it is for this reason that the standard possession order does not apply to children under three years of age. *See* TEX. FAM.CODE ANN. §§ 153.251(d), 153.254 (Vernon 1996). According to Dr. Ferrell, there is a "very, very high probability that [Madison] would be impaired if separated from that home situation that she relies upon as being her home." Dr. Ferrell further testified that such a separation would be "very traumatic on a child" and likened it to "psychological amputation." He warned that if "[y]ou disrupt the psychological attachment," "you're going to do serious psychological damage."

Dr. Carol Clark, a licensed psychologist with over ten years experience who testified on Mark's behalf, agreed with Dr. Ferrell that the first three years of a child's life are critical in the child's development of "attachment." Dr. Clark also testified that she simply could not say that psychological damage to Madison could be avoided if she were removed from her home. The damage could be anywhere from low to severe and, at best, it could be minimized by ensuring that the transition was gradual, and the homes and parenting abilities in both situations were similar. Dr. Clark warned that "the older a child is, then of course the more attachment is there and the more difficult it will be." Dr. Clark stated that the best people to decide the extent to which Madison would be impaired would be the members of the jury. Dr. Clark herself was not familiar with the homes or parenting abilities of the Walshes or Mark. However, Ann O. Jarrell, a licensed marriage and family therapist, had conducted a social study and testified that Mark and his family are able to provide Madison with a stable and loving home environment and meet her emotional, physical, and financial needs.

Before submission of the charge, the request to terminate Mark's parental relationship with Madison was abandoned. Accordingly, the court's charge inquired only whether Mark or the Walshes should be named as Madison's managing conservators. The jury was expressly instructed that they should name Mark as managing conservator unless they found that would not be in Madison's best interest because it would significantly impair her physical health or emotional development. After lengthy deliberations, the jury found that the Walshes should be named Madison's joint managing conservators, and the trial court signed a decree in accordance with the jury's finding. The trial court's judgment also named Mark as Madison's possessory conservator, established a liberal visitation schedule in his favor, and changed Madison's name to Madison Walsh–Humberson.

Mark moved for a new trial, arguing that the supreme court's decision in *Lewelling v. Lewelling,* 796 S.W.2d 164, 167 (Tex.1990), required the Walshes to prove not only that Madison would be significantly impaired if Mark were named her managing conservator, but also that the impairment would be caused by some act or omission by Mark, and there was legally and factually insufficient evidence of this fact. The trial judge denied the motion, explaining:

### Discussion

The issue is whether the natural parent (Mark) must have some culpability, either by commission or omission, in creating the environment which "significantly impairs the physical health or emotional development" of his daughter (Madison), thus forfeiting his priority status over a non-parent (Matt and Mindy) seeking managing conservatorship.

### Culpability Required

[The Walshes' attorney] argues that there is sufficient evidence of Mark's behavior to support the jury's verdict. Evidence cited consists of:

— having unprotected sex with the mother (Sally);

— failure to adequately inquire as to whether Sally was pregnant;

— failure to diligently establish he was the father once he discovered Sally was indeed pregnant;

— failure to aggressively and timely pursue his legal remedies (i.e., intervention, blood testing);

— failure to contribute child support at an earlier time; and

— having his mother address and mail the child support checks to the Walshes and greeting cards to Madison.

If this was the sole basis for the jury's verdict, I would grant a new trial. . . . . I do not believe that the evidence established that Mark by any act or omission on his part created an environment which would "significantly impair" Madison's "physical health or emotional development". Nor is there any conduct or character flaw attributed to Mark demonstrated by the evidence which could be construed as jeopardizing his priority status as provided in sec. 153.131, Texas Family Code.

*Culpability Not Required*

I do not believe that sec. 153.131, Texas Family Code contemplates that the environment which "significantly impairs the child's physical health or emotional development" must be the product of some act or omission on the part of the natural parent.

In this case, Jack Ferrell, Ph.D. emphatically stated that to remove Madison from the Walsh's home was equivalent to "psychological amputation". Though there was conflicting expert testimony, the jury was free to believe or not believe any or all of the testimony of the witnesses. Dr. Ferrell's testimony standing alone would support the jury's finding.

Madison's case is unique and distinguishable from the authority [including *Lewelling* ] cited by counsel. This is not a case of the "lesser of two evils" or which choice of homes is a "better home". There is

evidence which forcefully presents an argument that regardless of how we arrived at Madison's present living arrangement, a situation now exists that precludes placing her with her natural father without "significantly impairing" the child's emotional development.

Mark appeals, contending that *Lewelling* controls, and the evidence is legally and factually insufficient under the *Lewelling* standard.

## SCOPE AND STANDARDS OF REVIEW

The scope and standards for sufficiency review are well-established. To determine whether there is legally sufficient evidence, we review "only the evidence and the inferences tending to support the [jury's] finding and disregard all evidence and inferences to the contrary." *E.g., Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965). If there is more than a scintilla of evidence to support the finding, the legal sufficiency challenge must fail. *Stafford v. Stafford,* 726 S.W.2d 14, 16 (Tex.1987). Conversely, to determine whether there is factually sufficient evidence to support a jury finding, we review the entire record to determine if the finding "is so against the great weight and preponderance of the evidence as to be manifestly unjust." *E.g., Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986). *See generally* Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 TEX. L.REV. 361 (1962).

## DISCUSSION

Before delving into the law that applies in this case, we believe it is important to first clarify the law that does not apply. If this were a case in which Mark's parental rights had been terminated, the issue would be whether any act or omission by Mark had jeopardized Madison's physical health or emotional development. *See* TEX. FAM.CODE ANN. § 161.001 (Vernon 1996); *In the Interest of J.F., B.D., S.F., and T.F.,* 888 S.W.2d 140 (Tex.App.—Tyler 1994, no writ); *Ybarra v. Texas Dep't of Human Services,* 869 S.W.2d 574 (Tex.App.—Corpus Christi 1993, no writ). But this is not a termination case. Under the trial court's judgment, Mark re-

tains his parental relationship with Madison, and he is entitled to substantial visitation.

This is also not a case in which a jury has denied managing conservatorship to a parent and primary caretaker who is a fit but perhaps not a perfect parent. *See Lewelling,* 796 S.W.2d at 167–68; *In re W.G.W.,* 812 S.W.2d 409, 411 (Tex.App.—Houston [1st Dist.] 1991, no writ). Nor is this a case in which the parent seeking custody is simply unfit. *See Thomas v. Thomas,* 852 S.W.2d 31 (Tex.App.—Waco 1993, no writ).

This case is more difficult than any of those cited above and relied upon by Mark, because here the issue is whether two-year-old Madison's best interest is served by naming as her primary caretakers Matt and Mindy Walsh, who are not her parents but who have been her primary caretakers since the day after her birth, or Mark Humberson, who is Madison's biological parent but who has never been her primary caretaker and who in fact had visited with her only twice by the time of trial. Against this factual background, the specific issue presented by Mark is whether sufficient evidence supports the jury's implied finding that naming him as Madison's managing conservator would not be in her best interest because it would significantly impair her physical health or emotional development. This is the issue we discuss below.

### Texas Standard for Managing Conservatorship by a Non–Parent

"[I]n determining the issues of conservatorship and possession of and access to the child," "[t]he best interest of the child shall always be the primary consideration of the court." TEX. FAM.CODE ANN. § 153.002 (Vernon 1996). The affections and feelings of parents, including biological fathers, are thus secondary to the best interest of the child. *Bukovich v. Bukovich,* 399 S.W.2d 528, 529 (Tex.1966); *see also Haymond v. Haymond,* 74 Tex. 414, 12 S.W. 90, 93 (1889).

Texas law presumes that a child's best interest is served by naming the child's parent or parents as managing conservators. TEX. FAM.CODE ANN. § 153.131(b) (Vernon 1996). But this presumption is "rebuttable." *Id.* A rebuttable presumption "shift[s] the burden of producing evidence to the party against whom it operates." *General Motors Corp. v. Saenz,* 873 S.W.2d 353, 359 (Tex. 1993). However, "[o]nce that burden is discharged and evidence contradicting the presumption has been offered, the presumption disappears and 'is not to be weighed or treated as evidence.'" *Id.* (quoting *Combined Am. Ins. Co. v. Blanton,* 163 Tex. 225, 353 S.W.2d 847, 849 (1962)). "The evidence on the issue is then evaluated as it would be in any other case. .... The presumption has no effect on the burden of persuasion." *Saenz,* 873 S.W.2d at 359 (citations omitted); *see also Choyce v. Dallas County Child Welfare Unit,* 642 S.W.2d 559, 561 (Tex.App.— Dallas 1982, no writ).

Because Texas law presumes that a child's best interest is served by naming the child's parent or parents as managing conservators, "a parent shall be appointed sole managing conservator or both parents shall be appointed as joint managing conservators of the child" "[u]nless the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development...." TEX. FAM.CODE ANN. § 153.131(a) (Vernon 1996). Accordingly, at the hearing on managing conservatorship, the burden is on the non-parent to initially produce evidence and make the showing required by section 153.131(a) by a preponderance of the evidence. *See id.* § 105.005; *Lewelling,* 796 S.W.2d at 167. Significantly, a jury's custody's determination is binding on the trial court if it is supported by the evidence. TEX. FAM.CODE ANN. § 105.002(c) (Vernon 1996); *e.g., In re Y,* 516 S.W.2d 199, 204–05 (Tex.Civ.App.—Corpus Christi 1974, writ ref'd n.r.e.). The jury's decision is also entitled to substantial deference in this court, as demonstrated by the standards of review set forth above. We are not permitted to act, and will not act, as a second jury; accordingly, we do not pass upon the credibility of the witnesses or otherwise substitute our judgment for that of the jury. *See Pool,* 715 S.W.2d at 634–35.

In sum, Texas law permits naming a nonparent as a child's managing conservator even when both biological parents' rights have not been terminated but only if the appointment of the parent would not be in the child's best interest, because it would significantly impair the child's physical health or emotional development; it entrusts juries with these difficult issues; and it prohibits this court from setting aside the jury's verdict if there is legally and factually sufficient evidence to support it.

### Lewelling v. Lewelling

■ Both parties eschew the standard for managing conservatorship set forth in section 153.131(a) of the Texas Family Code in favor of language in *Lewelling* requiring the nonparent "to identify some act or omission committed by [the parent] which demonstrates that naming [the parent] as managing conservator will significantly impair [the child's] physical health or emotional development." *Lewelling,* 796 S.W.2d at 168. Mark thus argues that there is insufficient evidence that any acts or omissions by him demonstrate that naming him as managing conservator will significantly impair Madison, while the Walshes argue the contrary. In our view, however, this language is not controlling in this case, as the trial court ruled and as the facts and holding of *Lewelling* demonstrate.

Brenda and Billy Lewelling's child, Jesse, was born April 1, 1987. *Lewelling v. Lewelling,* 774 S.W.2d 801, 802 (Tex.App.—El Paso 1989), *rev'd,* 796 S.W.2d at 168–69. In August 1987, the couple separated, and in October 1987, Brenda filed for divorce. *Lewelling,* 774 S.W.2d at 802. Although Billy did not seek custody of Jesse, Billy's parents filed a plea in intervention seeking appointment as Jesse's temporary and permanent managing conservators. *Id.* At the hearing on temporary orders, however, the trial court named the Texas Department of Human Services as Jesse's temporary managing conservator, and the Department placed Jesse with Brenda until final hearing. *Id.*

A final hearing was held in March 1988. *Id.* At this hearing, several witnesses testified that Billy had physically abused Brenda, but not Jesse; Brenda continued to see Billy

during the pendency of the divorce proceeding and testified that she might consider reconciling with him if he sought counseling; Brenda did not see her son for approximately two months after her husband beat her and took their son to his parent's home, where Billy also lived; Brenda was unemployed, had little money, and lived in a small home with her mother and other members of her family; and Brenda had twice been a patient in a state hospital. *Lewelling,* 796 S.W.2d at 165–66. However, the testimony also "clearly showed that Brenda Lewelling was a good mother. No one testified that she was in any way harmful to the child." *Id.* at 169 (Cook, J., concurring). Nonetheless, at the conclusion of the hearing, without "referencing specific evidence, the trial court concluded that naming Brenda as managing conservator would significantly impair Jesse's physical health and emotional development" and named Billy's parents as Jesse's managing conservators; Brenda and Billy were named possessory conservators. *Id.* at 165.

The supreme court reversed. *Id.* at 168–69. During the course of its opinion, the court stated that section 153.131 "requires the nonparent to offer evidence of specific actions or omissions of the parent that demonstrate an award of custody to the parent would result in physical or emotional harm to the child." *Id.* at 167; *see also id.* at 168. In our opinion, however, this statement should be viewed in the context of the facts of the case and the court's actual "hold[ing] that evidence that a parent is a victim of spousal abuse, by itself, is no evidence that awarding custody to that parent would significantly impair the child." *Id.* at 167.

When the court's requirement of a causal connection between acts or omissions of the parent and significant impairment to the child is considered in context, we believe it is apparent that the court did not intend to supplant the legislatively-mandated standard set forth in section 153.131. Rather, the court clarified that there must be either direct evidence that placement of the child with the parent would significantly impair the child's physical health or emotional development or direct evidence from which a factfinder could reasonably (or perhaps even neces-

sarily) reach that conclusion. In the case before it, there was no direct evidence that Jesse would be significantly impaired by naming Brenda managing conservator. Accordingly, the issue before the court was whether the trial court, sitting as the trier of fact, could permissibly infer that ultimate fact from the direct evidence.

In resolving this "no evidence" issue of reasonable inferences, the supreme court made clear that the trial court may not infer significant impairment from direct evidence that the parent seeking custody is or has been abused by her spouse, unemployed, living in crowded conditions, or committed to a mental institution for a short period of time. *Id.* at 167. Nor is an inference of significant impairment permissible when the evidence merely shows that a non-parent "might be a better custodian of a child," *id.* at 169 (Cook, J., concurring), or that placement of the child with a parent might constitute a "potential threat" to the child's physical health or emotional development. *Id.* at 175 (Hecht, J., dissenting). Finding no evidence from which significant impairment could be permissibly inferred, the court reversed the trial court's judgment and remanded the case to the trial court so that it could render judgment naming Brenda as Jesse's managing conservator. *Id.* at 169.

In our view, *Lewelling* is not a case in which the supreme court attempted to override the legislative standard set forth in section 153.131. Rather, *Lewelling* is a case in which the supreme court exercised its constitutional authority to determine what is and is not "some evidence" of significant impairment, the ultimate fact to be determined under section 153.131. Accordingly, when the court reiterated the appropriate standard in *Brook v. Brook,* 881 S.W.2d 297 (Tex. 1994), it did not recite the language in *Lewelling* relied upon by the parties in this case but the legislative standard contained in section 153.131. *Id.* at 298.

Moreover, as demonstrated above, *Lewelling* is materially distinguishable from this case on the facts. *Lewelling* is a case in which a trial judge, sitting as the trier of fact, deprived a parent and primary caretaker of managing conservatorship because the parent was imperfect, despite the complete absence of evidence that these imperfections would cause the child any significant impairment. This case, on the other hand, is a case in which a jury, after hearing direct evidence that appointment of Mark as managing conservator would significantly impair Madison's emotional development, decided that it would be in her best interest to appoint the Walshes, Madison's primary caretakers since birth, as her managing conservators. In light of these material differences, we decline to engraft the *Lewelling* language onto the section 153.131 standard for determining managing conservatorship in this case. To do so, we believe, would improperly render Madison's best interest coterminous with Mark's fitness to act as a parent and merge the standard for the termination of parental rights with the very different standard for custody determinations. *Compare* TEX. FAM.CODE ANN. § 161.001 (Vernon 1996) *with id.* § 153.131.

### Sufficiency of the Evidence
### Under Section 153.131

■ The undisputed expert testimony introduced in this case establishes that Madison's emotional development will be impaired to some extent if she is removed from the Walshes' care. The only direct evidence as to the extent of the impairment is Ms. Wanderwerf's testimony that removing Madison from the Walshes' care would be "devastating" to her and Dr. Ferrell's testimony that disruption of Madison's psychological attachment to the Walshes would be akin to "psychological amputation" and cause "serious psychological damage." However, in line with Dr. Clark's recommendation, the jury also heard and was entitled to consider the substantial testimony regarding the homes and parenting abilities of Mark and the Walshes, including that Mark had no other children, while the Walshes had another baby girl, whom Madison considered her little sister; Mark did not return the Walshes' phone calls and, in fact, it was his mother who initiated all phone calls to the Walshes and bought, wrapped, and addressed the cards and presents sent by the Humbersons to Madison; Mark arranged to visit Madison but then never showed up; Mark did not

send Madison a Christmas present; and Mark did not sign up for a parenting class until after his two visits with his daughter and shortly before trial.

■ When measured against the yardstick established in section 153.131, the jury's finding that naming Mark managing conservator would not be in Madison's best interest because it would significantly impair her emotional development is plainly supported by some evidence, and it is not so against so the great weight and preponderance of the evidence as to be manifestly unjust.[2]

## CONCLUSION

It is well-established that a biological father who demonstrates an interest and commitment to his child has rights of constitutional dimension. *See generally* Deborah L. Forman, *Unwed Fathers and Adoption: A Theoretical Analysis in Context,* 72 TEX. L.REV. 967, 971–78 (1994). And we know beyond any doubt that single fathers can be the finest of parents and do not doubt that many "[m]en experience a profound sense of loss when they are denied custody of their children. . . ." *Id.* at 994. We therefore applaud Mark's efforts to establish a parent-child relationship with Madison and his commitment to her. But Mark's fitness and commitment as a parent are of only secondary importance in this case. The overarching consideration is Madison's best interest— Madison's "interest to grow up free of avoidable, severe emotional scarring." *John E. v.*

*Doe,* 164 A.D.2d 375, 564 N.Y.S.2d 439, 447 (1990) (Rosenblatt, J., concurring), *appeal denied,* 78 N.Y.2d 853, 573 N.Y.S.2d 466, 577 N.E.2d 1058 (1991).

Through no fault of Madison's or her father's, the only home Madison has ever known is with Matt and Mindy Walsh. And the undisputed expert testimony and the jury's verdict establish that to remove Madison from her home at this point in time would not serve her best interest because it would significantly impair her emotional development. That is the standard for naming a non-parent as managing conservator set forth in section 153.131 of the Texas Family Code, the standard submitted to the jury by the trial court without objection by either party, and the only standard that we believe is applicable in this case. For this reason, and this reason alone, we overrule Mark's points of error and affirm the trial court's judgment naming the Walshes as Madison's managing conservators but affording Mark Humberson the rights, including substantial visitation, of her possessory conservator. We trust that the love all concerned feel for Madison will continue to yield the same level of cooperation as has been exhibited during the pendency of this litigation.

We realize, as did the jury and trial judge, that our judgment does not encompass a perfect or painless resolution of the difficult issues involved in this case. But it plainly reflects an appropriate remedy. *See* Forman, 72 TEX. L.REV. at 1042 n. 490 & accom-

2. We believe there may also be an independent reason that Mark's sufficiency points of error must be overruled and the judgment affirmed. There can be no doubt that the court's charge submitted the controlling issue in this case, and Mark has not complained on appeal that the charge was defective. Mark has thus waived the error, if any, in the trial court's failure to instruct the jury under the *Lewelling* standard. *Allen v. American Nat'l Ins. Co.,* 380 S.W.2d 604, 609 (Tex.1964). In these circumstances, the sufficiency of the evidence is usually measured against the statements of law contained in the charge, even if they are defective. *See, e.g., Sage Street Assoc. v. Northdale Constr. Co.,* 863 S.W.2d 438, 447 (Tex.1993) (court of appeals erred in measuring the sufficiency of the evidence against what it believed to be the correct measure of damages rather than the measure of damages actually submitted to the jury). When measured against the court's charge, without regard to the additional requirement stated in *Lewelling,* the evidence recited above is plainly sufficient to support the jury's finding that naming Mark as Madison's managing conservator would not be in her best interest because it would significantly impair her physical health or emotional development. However, in light of the unique constitutional interests involved, we believe it is preferable to rest our judgment upon what we believe to be the applicable substantive law rather than waiver, particularly in light of the supreme court's exhortation that "'the decisions of the courts of appeals [should] turn on substance rather than procedural technicalities.'" *City of San Antonio v. Rodriguez,* 828 S.W.2d 417, 418 (Tex.1992) (per curiam) (quoting *Crown Life Ins. Co. v. Estate of Gonzalez,* 820 S.W.2d 121, 121 (Tex.1991) (per curiam)). We further note that neither of the parties has briefed the continuing viability of *Allen* in the context of this particular case or in general.

panying text (suggesting appropriate solution in some cases would be to permit the biological father visitation) (citing Martha Field, *Family Restructuring at the End of the Twentieth Century,* presented at INTERNATIONAL SOCIETY OF FAMILY LAW CONFERENCE (June 11, 1993)). And it is a remedy we believe to be within the confines of Texas law and the evidence. We therefore affirm the trial court's judgment in all respects.

CARR, Justice,[1] dissenting.

In my view, the dispositive issue this appeal presents is whether, under the facts and law of this case, there is sufficient evidence, or any evidence, to support the trial court's judgment appointing a non-parent managing conservator of Baby Girl Rodriguez, a minor child.

Appellant Mark Humberson's two points of error contend that the trial court erred in failing to grant appellant's motion for directed verdict and motion for judgment non obstante veredicto because there is no evidence [point one] and insufficient evidence [point two] to support a jury submission or finding that appointment of appellant as managing conservator would significantly impair the child's physical or emotional development. *See* TEX. FAM.CODE ANN. § 153.131(a) (Vernon 1996) and *Lewelling v. Lewelling,* 796 S.W.2d 164 (Tex.1990).

To the extent that appellant claims error because of the trial court's refusal to grant appellant's motion for judgment non obstante veredicto, I agree with the majority that that portion of appellant's appeal should be denied because the trial court in this type of case does not possess the power to grant a motion for judgment non obstante veredicto. *See* TEX. FAM.CODE ANN. § 105.002(c) (Vernon 1996); *In Interest of Soliz,* 671 S.W.2d 644, 647–48 (Tex.App.—Corpus Christi 1984, no writ). Consequently, the trial court properly denied appellant's motion for judgment non obstante veredicto.

However, while I agree with the majority that our record reflects "that there is no evidence that any act or omission, behavior, or conduct by Mark will impair Madison [the child]," I respectfully dissent because, unlike the majority, I do not agree that this case is a case of first impression nor distinguishable from *Lewelling v. Lewelling,* 796 S.W.2d 164 (Tex.1990). I would hold on this legal issue that *Lewelling* is controlling; and, that at the present time under the current state of Texas laws, the *Lewelling* standard that non-parents seeking custody here cannot benefit from their bonding or attachment with the child by "offering it as some evidence of significant impairment to [the child]." *Id.* at 168. Accordingly, because appellees Walshes' significant impact argument was rejected by our Supreme Court in *Lewelling,* we are required to reject the same argument here.

Applying the correctly stated standards of review set out by the majority to the evidence in our record through the prism of the *Lewelling* view of TEX. FAM.CODE ANN. § 153.131(a) (Vernon 1996), I find there is no evidence and insufficient evidence to support a jury submission or finding that appointment of the parent in this case [Mark Humberson] as managing conservator would significantly impair the child's physical or emotional development. Accordingly, I would reverse the trial court's order naming the Walshes managing conservators and render a decision naming Mark Humberson, the parent, managing conservator.

For the reasons stated, I respectfully dissent.

---

1. Assigned to this case by the Chief Justice of the Supreme Court of Texas pursuant to TEX. GOV'T

CODE ANN. § 75.003(a) (Vernon Supp.1996).