

## Fourth Court of Appeals
### San Antonio, Texas

**MEMORANDUM OPINION**

No. 04-23-00617-CV

**IN THE INTEREST OF D.C.N.**, a Child

From the 438th Judicial District Court, Bexar County, Texas
Trial Court No. 2021-PA-00502
Honorable Martha B. Tanner, Judge Presiding

Opinion by:      Beth Watkins, Justice

Sitting:         Luz Elena D. Chapa, Justice
                 Beth Watkins, Justice
                 Lori I. Valenzuela, Justice

Delivered and Filed: December 20, 2023

REVERSED AND REMANDED

Appellants E.R. (Mother) and C.N. (Father) challenge the trial court's order regarding conservatorship of their child, D.C.N. (born 2019).[1] We reverse the trial court's order and remand this cause for a new trial.

### BACKGROUND

In November of 2020, the Texas Department of Family and Protective Services established a safety plan for D.C.N. due to Mother's drug use. At that time, Mother and D.C.N. lived with Mother's brother, Donnie Fletcher, Jr., and his then-girlfriend, Desiree Rios. Mother eventually left the home because she did not get along with Rios, but D.C.N. stayed. In March of 2021, the

---

[1] To protect the privacy of the minor children, we use initials or pseudonyms to refer to the children and their biological parents. TEX. FAM. CODE ANN. § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

Department obtained temporary managing conservatorship over D.C.N. and maintained his placement with Donnie Jr. and Rios. The couple's relationship ended while this case was pending, but D.C.N. remained in Rios's care.

The Department filed a petition to terminate the parental rights of Mother and B.H., the man Mother identified as D.C.N.'s father. The Department also created a family service plan requiring Mother to complete several tasks as a condition of reunification, including a drug assessment, drug treatment, a psychological evaluation, individual counseling, and parenting classes. Rios filed a petition in intervention seeking sole managing conservatorship of D.C.N. and termination of both parents' rights.[2] When genetic testing revealed that B.H. was not D.C.N.'s father, the Department filed an amended petition that identified Father as D.C.N.'s father and sought to terminate both Mother's and Father's parental rights. Mother filed a counterpetition seeking sole managing conservatorship of D.C.N. or, in the alternative, a "monitored return of the child" to her custody.

The Department did not ultimately pursue termination of Mother's or Father's parental rights. Nor did it seek a "monitored return" of D.C.N. to Mother under the continued supervision of the Department and the court.[3] Instead, nineteen months after removal, the trial court held a five-day bench trial at which the Department sought "a shared custody between [Rios] and [M]other" and possessory conservatorship for Father. The trial court heard testimony from eleven witnesses: (1) Rita Garcia, the Department supervisor assigned to this case; (2) Crystal Jones, the Department caseworker assigned to this case at the time of trial; (3) Esperanza Guerra, Mother's aunt; (4) Donnie Fletcher, Sr., Donnie Jr.'s father who is "like [Mother's] stepfather"; (5) Rios; (6) Donnie Jr.; (7) Mother; (8) Father; (9) Corina Alvarez, a teacher at D.C.N.'s daycare; (10) Sara

---

[2] Donnie Jr. also filed a petition in intervention, but he non-suited his petition after his relationship with Rios ended.
[3] *See* TEX. FAM. CODE ANN. § 263.403.

Vasquez, Mother's aunt and the caretaker of Mother's two older children; and (11) D.R., Mother's oldest child.

At the conclusion of trial, the court signed an order dismissing the Department from this case and appointing Rios and Mother as D.C.N.'s joint managing conservators. The trial court's order identified Rios as D.C.N.'s "primary joint managing Conservator," granted her the exclusive right to designate his residence within Bexar and contiguous counties, and granted Mother unsupervised visitation two weekends a month and on holidays. The trial court's order appointed Father possessory conservator and granted him supervised visitation during Mother's periods of possession. Mother and Father both appealed.

## ANALYSIS

On appeal, Mother argues the trial court abused its discretion by appointing Rios joint managing conservator with the exclusive right to designate D.C.N.'s primary residence. Father argues the trial court abused its discretion by limiting his possession of the child.

### Standard of Review and Applicable Law

"When determining the issues of conservatorship, possession, and access to a child, a trial court shall put the child's best interest first. But the parties vying for the rights of conservatorship, possession, and access are not always treated equally." *In re S.D.*, No. 02-14-00171-CV, 2014 WL 6493783, at *12 (Tex. App.—Fort Worth Nov. 20, 2014, no pet.) (per curiam) (mem. op.) (footnote omitted). Both the United States Supreme Court and the Texas Supreme Court have recognized that natural parents have a constitutionally protected liberty interest in the care, custody, and control of their children. *Troxel v. Granville*, 530 U.S. 57, 65–66 (2000); *In re C.J.C.*, 603 S.W.3d 804, 811–12 (Tex. 2020). This liberty interest "does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). "[S]o long as a parent adequately cares for his or her children (*i.e.*, is

fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." *Troxel*, 530 U.S. at 68–69.

"[T]he fit-parent presumption is deeply embedded in Texas law as part of the determination of a child's best interest." *In re C.J.C.*, 603 S.W.3d at 812 (internal quotation marks omitted). The Texas Legislature has enshrined this fundamental interest in a statutory parental presumption:

> [U]nless the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development, a parent shall be appointed sole managing conservator or both parents shall be appointed as joint managing conservators of the child.

TEX. FAM. CODE ANN. § 153.131(a); *In re C.J.C.*, 603 S.W.3d at 812–13; *see also* TEX. GOV'T CODE ANN. § 311.016(2) ("'Shall' imposes a duty."). This statute is a legislative limit on the general rule that a trial court has broad discretion to determine a child's best interest. *See C.O. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-21-00453-CV, 2022 WL 413374, at *1 (Tex. App.—Austin Feb. 11, 2022, no pet.) (mem. op.).

When both a parent and a non-parent seek managing conservatorship of a child, the non-parent must "offer evidence of specific actions or omissions of the parent that demonstrate an award of custody to the parent would result in physical or emotional harm to the child." *Lewelling v. Lewelling*, 796 S.W.2d 164, 167 (Tex. 1990). "Acts or omissions that constitute significant impairment include, but are not limited to, physical abuse, severe neglect, abandonment, drug or alcohol abuse, or immoral behavior by the parent." *In re S.T.*, 508 S.W.3d 482, 492 (Tex. App.—Fort Worth 2015, no pet.). A trial court may also consider evidence of "parental irresponsibility . . . bad judgment, child abandonment, and an unstable, disorganized, and chaotic lifestyle that has put and will continue to put the child at risk." *Id.*

In reviewing evidence of the parent's conduct, "[t]he material time to consider is the present[.]" *C.O.*, 2022 WL 413374, at *4. While evidence of "the parent's recent, deliberate past misconduct" may support a finding that a parent is unfit, "evidence of past misconduct, standing alone, may not be sufficient to show present unfitness." *In re M.O.*, No. 05-19-00413-CV, 2019 WL 4071999, at *2 (Tex. App.—Dallas August 29, 2019, no pet.) (mem. op.). "The link between the parent's conduct and harm to the child may not be based on evidence that merely raises a surmise or speculation of possible harm." *In re S.T.*, 508 S.W.3d at 492–93. A non-parent's burden to make the required showing of impairment is a heavy one "that is not satisfied by merely showing that the non-parent would be a better custodian of the child." *Critz v. Critz*, 297 S.W.3d 464, 474–75 (Tex. App.—Fort Worth 2009, no pet.). "Although there may be many reasons that appointing [a parent] as managing conservator rather than [a non-parent] might not be in the child's best interest, the only reason sufficient to rebut the parental presumption is a threat to the child's physical or emotional safety." *In re B.B.M.*, 291 S.W.3d 463, 472 (Tex. App.—Dallas 2009, pet. denied).

While an order terminating parental rights must be supported by clear and convincing evidence, "a finding that appointment of a parent as managing conservator would significantly impair the child's physical health or emotional development is governed by a preponderance-of-the-evidence standard." *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). We review a trial court's conservatorship ruling for abuse of discretion, and we may reverse that ruling only if the trial court acted arbitrarily, unreasonably, or without reference to guiding rules or principles. *See A.S. v. Tex. Dep't of Fam. & Protective Servs.*, 665 S.W.3d 786, 795 (Tex. App.—Austin 2023, no pet.). Under this standard, "challenges to the legal and factual sufficiency of the evidence are not independent grounds of error but instead are factors used to determine whether the trial court abused its

discretion." *Id.* We consider "whether the trial court had sufficient information on which to exercise its discretion and, if so, whether the trial court erred in its application of discretion." *Id.*

A trial court does not abuse its discretion if its ruling is supported by some substantive, probative evidence. *Id.* Where, as here, an appellant attacks the legal sufficiency of an adverse finding on which she did not bear the burden of proof at trial, the appellant must show there is no evidence to support the finding to prevail. *See Zeifman v. Michels*, 212 S.W.3d 582, 588 (Tex. App.—Austin 2006, pet. denied). To prevail on a factual insufficiency challenge, the appellant must show the finding "is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust." *Id.* at 589; *A.S.*, 665 S.W.3d at 795. In resolving questions of conservatorship between a parent and a non-parent, "'close calls' should be decided in favor of the parent." *Critz*, 297 S.W.3d at 475; *see also Lewelling*, 796 S.W.2d at 168.

### *Application*

#### *Mother's Appellate Issue*

The trial court appointed Mother and Rios as D.C.N.'s joint managing conservators. However, it also found that "appointment of [Mother] as the child's managing conservator would significantly impair the child's emotional and physical development." To reach this outcome, the court must have implicitly concluded that Mother's appointment as *sole* managing conservator would significantly impair D.C.N.'s physical health or emotional development. *See In re L.D.F.*, 445 S.W.3d 823, 829 (Tex. App.—El Paso 2014, no pet.); *see also* TEX. FAM. CODE ANN. § 153.372 (non-parent may be appointed joint managing conservator along with a parent). Mother argues the trial court's ruling was an abuse of discretion because the evidence was legally and factually insufficient to support the finding of significant impairment.

In a legal sufficiency review, we consider only the evidence that supports the challenged finding, and we disregard all contrary evidence and inferences unless a reasonable factfinder could

not. *See, e.g.*, *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *Sotelo v. Gonzales*, 170 S.W.3d 783, 787 (Tex. App.—El Paso 2005, no pet.). Here, as noted above, the evidence showed that the Department removed D.C.N. from Mother's care due to Mother's drug use. The Department's supervisor, Garcia, identified Mother's "illegal substance of choice" as methamphetamine. Additionally, Mother's aunt, Vasquez, obtained "full custody" of Mother's two older children in 2017 after the Department brought a previous case involving Mother's "stability" and "drugs and neglect." Vasquez testified that Mother had a pattern of doing well after Department intervention and then relapsing:

> [W]hat she's doing currently is stuff she has done in the past, keep a job for a little bit, keep a stable home for a little bit, stay off drugs for a little bit. But who's not gonna do that while they're in CPS. There has to be somebody watching them.

Vasquez added, "It's just the repeated behavior that I worry about."

The Department's caseworker, Jones, testified that she was concerned about her observations of Mother continuing to associate with Father because Father tested positive for methamphetamines during this case and "[p]art of [Mother's] relapse plan is to stay away from people who have used drugs. And if she knew he was positive, then that should be something she should do." She testified that she believed Mother knew Father had tested positive for drugs because that issue was discussed "at one of the last hearings and so she said it on the 24th [of October 2022] to me as well." Garcia testified it was her "understanding [that] when two people are working on their sobriety, they should not be engaging, spending time with other people that are either actively using or also working on their sobriety[.]"

The evidence showed Mother was arrested for driving while intoxicated in "2018 or 2019" and again in September of 2021 while this SAPCR was pending. She also tested positive for alcohol in September of 2022, approximately two months before the trial in this case. While Mother testified that alcohol abuse had "never been an issue" for her, D.R. testified that he had

seen "[m]ultiple, multiple occasions of" Mother abusing alcohol in the past. Both Vasquez and D.R. testified that Mother's two older children had attended counseling, and D.R. described periods of his childhood when he did not have a stable home or enough to eat. D.R. also testified that he did not want to have contact with Mother.

Garcia testified that "there's been serious concern with mom's pattern and behavior where she has not been truthful through the entire case" and has "not demonstrated she is going to place her child's needs above her own." As support for this conclusion, Garcia and Jones testified that Mother did not voluntarily disclose the 2021 DWI to the Department and resisted the Department's suggestions to attend family therapy to improve her relationship with Rios. Garcia also testified that Mother "refuses" to get along with Rios.

Finally, the trial court heard evidence that D.C.N. is bonded to Rios and had lived with her for almost two years. Jones testified that she believed D.C.N. would be "significantly" affected by being removed from Rios's home and that it was not in his best interest to change his placement. D.R. testified that he believed Mother would withhold D.C.N. from Rios and Mother's older children, with whom D.C.N. had an established sibling relationship, if she were appointed sole managing conservator. Rios testified that when she, Mother, and D.C.N. shared a home, Rios and Donnie Jr. performed the bulk of "the day-to-day parenting duties" and Mother would "pop in when she felt that she wanted to pop in" to play with D.C.N.

The evidence described above is similar to evidence the Texas Supreme Court concluded was legally sufficient to support a trial court's finding that a parent's appointment as sole managing conservator would significantly impair a child's physical health or emotional development. *See Danet v. Bhan*, 436 S.W.3d 793, 797 (Tex. 2014) (per curiam). Based on the supreme court's analysis in *Danet*, we conclude the evidence was legally sufficient to support the trial court's impairment finding. *See id.*

However, our analysis does not end there. We must also consider whether the evidence was factually sufficient to support the challenged finding. *See id.* at 798 (remanding for factual sufficiency analysis); *see also In re B.B.M.*, 291 S.W.3d at 471–72 (concluding evidence was legally sufficient but factually insufficient to award conservatorship to non-parents). Unlike a legal sufficiency review, a factual sufficiency review requires us to "consider and weigh all the evidence, including disputed or conflicting evidence." *In re F.E.N.*, 542 S.W.3d 752, 761 (Tex. App.— Houston [14th Dist.] 2018, pet. denied). Here, much of the evidence that was contrary to the trial court's finding was undisputed. For example, the parties agreed that at the time of trial, Mother had completed all her required services and had voluntarily engaged in additional services not required by the Department, such as an extra parenting class. She was also receiving weekly in-home visits from a parenting instructor. She had obtained suitable employment and established a safe, stable home that Garcia and Jones agreed was appropriate for D.C.N.'s needs. Mother testified that when D.C.N.'s attorney ad litem visited her home, he told her she had "a nice little gig going here[.]"

Jones testified that during the visits she monitored between Mother and D.C.N., Mother addressed D.C.N.'s physical and emotional needs, was able to manage and redirect his behavior, and appropriately praised and comforted him. She also agreed that Mother's visits with D.C.N. met the Department's expectations "every single time." By the time of trial, Mother had unsupervised visits with D.C.N. twice a week "from 10:00 in the morning till about 6:30, 7:00," and the Department did not express any concerns about those unsupervised visits. Garcia testified that "at this time," she did not believe Mother would cause any significant impairment to D.C.N.'s physical or emotional needs, and Jones testified that Mother had "[n]o impairments" that were contrary to D.C.N.'s physical and emotional needs. Garcia and Jones both testified that they believed Mother was ready for unsupervised overnight visits with D.C.N.

The evidence further showed that Mother's urinalysis tests were consistently negative for illicit drugs for at least six months prior to trial,[4] her hair follicle tests were negative for at least three months prior to trial, and the levels detected in her hair follicle tests began trending downward after November of 2020.[5] She had also created a relapse plan, and she was able to articulate that plan to the trial court.

While Jones testified that a parent's past drug use "will always be a concern because anybody can relapse," she agreed Mother was taking the necessary steps to address and alleviate concerns about her drug use. Garcia agreed that it was fair to say Mother had been rehabilitated. Donnie Jr., who testified that he saw Mother regularly, described her as "healthy," "glowing," and "a completely different person" than she was at the beginning of this case. He explained, "I've never seen my sister in my entire life change. She was one of the most stubborn people I knew and to see her finally get up and say, I'm going to do something. I'm going to face it. I believe whole-heartedly, yes [that Mother had made significant changes]." Donnie Sr., who testified that he had known Mother since she was a small child and was in regular contact with her, told the trial court that she was in the best shape she had been in for years. Donnie Jr., Donnie Sr., and Mother's aunt Esperanza Guerra all testified they would be protective of D.C.N. if Mother relapsed. Jones testified that five family members had made the same representations to her, and she stated that she had no reason to doubt those individuals.

As noted above, the trial court heard evidence that Mother abused alcohol in the past and was charged with DWI twice, including once during this case. However, no party presented direct or circumstantial evidence linking her alcohol use to any actual or probable harm to D.C.N. *See*

---

[4] Jones testified that Mother submitted to urinalysis tests "[m]ultiple times. Once a week."

[5] Jones testified that "hair follicles go back 90 days[.]" She explained that Mother's November 2020 hair follicle test showed levels "in 11,000 area," but dropped to 8,000 by April of 2022, 5,000 by May of 2022, and zero by August of 2022. Mother's last pre-trial hair follicle test, which occurred in September of 2022, was also negative.

*A.S.*, 665 S.W.3d at 799; *In re M.O.*, 2019 WL 4071999, at *7. Additionally, D.R.'s, Vasquez's, and the Department workers' testimony regarding Mother's past patterns of drug use and other inappropriate behavior, while relevant, did not directly implicate her present fitness to parent D.C.N. *See J.A.S. v. A.R.D.*, No. 02-17-00403-CV, 2019 WL 238118, at *4 (Tex. App.—Fort Worth Jan. 17, 2019, no pet.) (mem. op.); *In re K.R.B.*, No. 02-10-00021-CV, 2010 WL 3928727, at *11 (Tex. App.—Fort Worth Oct. 7, 2010, no pet.) (mem. op.). In fact, Vasquez testified that she had not seen Mother since July of 2021 and did not have regular contact with her. *See, e.g.*, *In re S.T.*, 508 S.W.3d at 492 (in determining whether evidence supports finding of significant impairment, "[t]he material time to consider is the present"). When asked what she knew about how Mother was doing, Vasquez responded, "I don't really," and she confirmed that she did not know anything about Mother's "recent conduct." *See id.* Similarly, D.R. testified that he had "not spoke[n] to [Mother] in over a year," was "[q]uite young" when he stopped living with her,[6] and was not aware of her current situation "to the fullest extent." *See id.*; *In re K.R.B.*, 2010 WL 3928727, at *11.

With regard to Mother's alcohol use during this case, the trial court did not hear any evidence about the circumstances that resulted in her 2021 DWI charge. We note, however, that the DWI occurred more than a year before the trial in this case and our review focuses on the time of trial. *See In re S.T.*, 508 S.W.3d at 492; *C.O.*, 2022 WL 413374, at *9. It was undisputed that Mother joined Alcoholics Anonymous after that incident, and she testified that she was attending twice a week at the time of trial. Jones agreed that this action "satisfied the Department," and the Department did not amend Mother's service plan to require any alcohol-related services. Mother also testified that her September 2022 positive alcohol test resulted from a single margarita at

---

[6] Vasquez testified that D.R., who was 15 at the time of trial, began living with her when he was 9.

dinner with a friend, which she described as a "foolish" choice that she was taking steps to avoid repeating. Neither the Department nor Rios presented any evidence to controvert that testimony; to the contrary, Jones testified that the Department tested Mother for alcohol twice more after her positive test, and those tests were negative. Additionally, Mother testified that her DWI charge was resolved during this case and she was sentenced to probation. There was no evidence that Mother had failed to comply with the terms of her probation or that the DWI charge presented any immediate threat of incarceration.

As noted above, Jones and Garcia expressed concern about Mother being around Father. However, Garcia testified that Father's most recent hair follicle test was negative, and she agreed that "those concerns about [Father] are eliminated." Jones testified that Mother's continued association with Father was formerly a concern, but "[n]ot right now." Furthermore, the Department itself recommended that Father's future visits with D.C.N. should be supervised by Mother. The Department's belief that Mother should supervise Father's visits with D.C.N. undermines its appellate argument that her association with Father was evidence of potential risk to D.C.N.

During the parties' closing arguments, Rios emphasized that the trial court had heard evidence that Mother did not have regular contact with her two older children. She argued this was evidence of "very specific concrete acts by [Mother] that can show this court that she is not ready to be a parent and she's certainly not a fit parent." It is true that D.R. testified he had not had recent contact with Mother because she "simply ha[d] not reached out" to her older children. However, both he and Vasquez testified that Vasquez, not Mother, made the decision to prevent contact between Mother and her older children during this case. D.R. testified that Mother had sent text messages to him and he "was told by [Vasquez] that I wasn't gonna be able to have contact with [Mother]." Similarly, Vasquez testified that Mother asked to see her older children and Vasquez

declined those requests. We decline to hold that this evidence established that Mother posed a present physical or emotional danger to D.C.N. *See Lewelling*, 796 S.W.2d at 168.

A significant portion of the trial testimony went to the bond between Rios and D.C.N. and the length of time he had lived in her home. This court has previously held that evidence of a child's attachment to a non-parent can be sufficient to overcome the parental presumption if that evidence "establishes that [the child's] emotional development will be impaired to some extent if she is removed from the [non-parents'] care." *In re Rodriguez*, 940 S.W.2d 265, 273–74 (Tex. App.—San Antonio 1997, writ denied). In *Rodriguez*, a child's natural father, who had "never been her primary caretaker," challenged an order awarding managing conservatorship to non-parents who had been her caretakers since birth. *Id.* at 266, 271. The *Rodriguez* trial court heard evidence that the child showed signs of emotional distress for weeks after visits with her natural father. *Id.* at 268. The court also heard expert testimony that there was "a 'very, very high probability'" the child would suffer "'serious psychological damage'" if she were separated from her non-parent caregivers. *Id.* at 269. Based on that evidence, we affirmed the trial court's award of managing conservatorship to the non-parent caregivers. *Id.* at 274.

In this case, the evidence showed that D.C.N. loved and was bonded to both Mother and Rios and called both women "mom" and "mommy." While Jones testified that she believed it would "significantly" affect D.C.N. if he were removed from Rios's home, neither the Department nor Rios presented evidence of any specific emotional or psychological effects that D.C.N. would probably suffer from a change in his placement. *See In re B.B.M.*, 291 S.W.3d at 468 ("The [non-parent caregivers] testified that they believed the boy would be significantly impaired if he was taken from them, but they presented no specific evidence to support this belief."); *see also In re C.J.C.*, 603 S.W.3d at 815–16 (concluding "nonspecific 'concerns'" were insufficient to overcome parental presumption). Nor did they present evidence that D.C.N. became upset after his visits

with Mother. *Contra In re Rodriguez*, 940 S.W.2d at 268. Unlike the evidence this court considered in *Rodriguez*, the evidence in this case showed D.C.N. was "happy, healthy, [and] taken care of" during his visits with Mother.

The Fort Worth Court of Appeals has held that evidence showing a child "had lived much of his life with [non-parent caregivers], he had bonded with [one of the non-parent caregivers], and he had difficulty adjusting to strangers" was factually insufficient to support a finding of significant impairment. *See In re K.R.B.*, 2010 WL 3928727, at *12. The Dallas Court of Appeals has similarly held that when a non-parent relies on the child's removal from his placement as evidence of significant impairment, "[a] mere potential threat, as opposed to evidence of actual harm to the child's emotional development, is insufficient" to overcome the parental presumption. *In re B.B.M.*, 291 S.W.3d at 468. We reach the same conclusion under the facts of this case. At most, the evidence presented below supported a surmise or speculation regarding the possible emotional effects of a transition from Rios's home to Mother's, which is not sufficient to overcome the parental presumption. *See id.*; *see also In re S.T.*, 508 S.W.3d at 492–93.

Finally, Garcia testified the Department did not "really trust" either Mother or Rios and that it sought joint conservatorship so the two could serve as a "check and balance" on each other. Neither the Department nor Rios, however, presented any evidence to support a conclusion that the same goal could not be accomplished through the monitored return that Mother's counterpetition sought as alternative relief. *See* TEX. FAM. CODE § 263.403. Nor did they present any evidence that this "check and balance" was necessary to ensure D.C.N.'s physical or emotional safety. *See In re B.B.M.*, 291 S.W.3d at 471–72. While Rios and Vasquez questioned Mother's parenting skills, and Rios testified that she believed she was "the best fit for [D.C.N.] primarily," evidence that may show "that a nonparent would be a better custodian of the child is wholly inadequate" to overcome the parental presumption. *Id.* at 467.

We recognize that in both a legal and factual sufficiency review, we must give deference to the trial court's determinations regarding the weight and credibility of the evidence. *See, e.g.*, *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). Furthermore, this case may present a close call. But both the constitution and "the Legislature ha[ve] mandated how close calls should be decided—in favor of the natural parent." *See Lewelling*, 796 S.W.2d at 168; *Critz*, 297 S.W.3d at 475. After reviewing the evidence as a whole, we conclude the finding that appointing Mother as D.C.N.'s sole managing conservator would significantly impair his physical health or emotional development was so against the great weight and preponderance of the credible evidence as to be manifestly unjust. *See, e.g.*, *A.S.*, 665 S.W.3d at 798–99; *C.O.*, 2022 WL 413374, at *8–9; *In re B.B.M.*, 291 S.W.3d at 471. Consequently, the trial court abused its discretion by concluding that Rios and/or the Department overcame the parental presumption. *See A.S.*, 665 S.W.3d at 795. We therefore sustain Mother's sole issue, reverse the portion of the trial court's order that appoints Mother and Rios joint managing conservators, and remand this cause for a new trial on managing conservatorship. *See id.* at 799; *C.O.*, 2022 WL 413374, at *9; *In re K.R.B.*, 2010 WL 3928727, at *12–13; *In re B.B.M.*, 291 S.W.3d at 471–72.

*Father's Appellate Issue*

In Father's sole issue on appeal, he argues the trial court's limitation on his possession and access was not in D.C.N.'s best interest. A trial court generally has broad discretion to determine a child's best interest in matters of visitation and possession. *See, e.g.*, *In re R.H.H.*, No. 04-09-00325-CV, 2010 WL 2842905, at *3 (Tex. App.—San Antonio July 21, 2010, no pet.) (mem. op.). Here, however, the trial court's order provides that Father shall have supervised possession of D.C.N. "during [Mother's] periods of possession." The order further provides that if Mother and Father do not agree to that possession schedule, Father "must give 48 hours notice to [Rios] of

their inability to agree." Finally, the order provides that either Mother or Rios may require Father to "submit to a drug test at his own expense and provide results to both."

Stated differently, the trial court's order explicitly ties Father's possession of D.C.N. to a joint managing conservatorship that we have now reversed. Under these unique circumstances, we conclude that our disposition of Mother's appeal requires us to also reverse the trial court's order as to Father's possession of and access to D.C.N. and remand this cause for a new trial on that issue. *See* TEX. R. APP. P. 43.2, 43.3; *cf. A.S.*, 665 S.W.3d at 799. On remand, the trial court "should consider the . . . parties' circumstances at that time." *A.S.*, 665 S.W.3d at 800. Additionally, if Rios again seeks to be appointed managing conservator, she must overcome the parental presumption as to both Mother and Father. *Id.* at 799 n.8; *Critz*, 297 S.W.3d at 471.

## CONCLUSION

We reverse the trial court's order and remand this cause for a new trial.


Beth Watkins, Justice