NUMBER 13-09-00255-CV



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG


 


DAVID GRAY, Appellant,


v.


ANN WOOD SHOOK, Appellee.

 




On appeal from the 24th District Court


of Victoria County, Texas.


 




O P I N I O N



Before Justices Yañez, Benavides, and Vela


Opinion by Justice Benavides


 Appellant, David Gray, appeals the trial court's appointment of appellee, Ann Wood
Shook, as sole managing conservator of his daughter, G.W. By one issue, Gray contends
that the trial court abused its discretion because (1) Shook did not offer sufficient evidence
of harm to overcome the parental presumption; (2) if the parental presumption was
overcome, Shook did not establish harm by a preponderance of the evidence; and (3)
Shook offered no evidence of any specific acts or omissions by Gray that would
significantly impair the physical health or emotional development of G.W. We reverse and
remand.

I. Background

 David Gray and Lucy Wood are the biological parents of G.W., who was born on
July 9, 2003. On January 30, 2007, Gray filed a suit affecting the parent-child relationship
stating, "The best interest of [G.W.] will be served by the appointment of [Lucy] as joint
managing conservator [of G.W.] with the exclusive right to designate the primary residence
of the child . . . ." Gray also requested that "appropriate orders be made for access to the
child and the allocation of the rights and duties of the conservators." On January 23,
2008, Ann Wood Shook, G.W.'s maternal grandmother, filed a petition in intervention
stating that she "would show that it is in the best interest of [G.W.] that Intervenor and
Respondent [Lucy] be appointed joint managing conservators of [G.W.]." Shook further
requested that she "be granted the exclusive right to establish the primary legal residence
of the child" and that Gray be appointed possessory conservator of G.W. Gray then
amended his petition requesting that he be appointed joint managing conservator with the
exclusive right to designate the primary residence of G.W. On June 30, 2008, a bench trial
was held at which Shook, Gray, Lucy, and Cheryl Green testified.

 Shook stated that G.W. has lived in her home in Victoria, Texas since she was born
and that when Lucy moved out of Shook's home approximately two years earlier, G.W.
continued living with Shook and her husband. Shook testified that she and her husband
have been "raising" G.W. for "about a year-and-a-half." According to Shook, she has filled
the role of co-parent with Lucy, and since G.W. was born, Shook and her husband have
"taken part in all aspects of raising [G.W.] together" because Lucy "didn't know how much
part [Gray] would be in her life." Shook testified that G.W. spends more time with her than
with Lucy and that presently, she and her husband are primarily responsible for raising
G.W. Shook acknowledged, however, that Lucy was still providing care for G.W. and
asked that Lucy be appointed joint managing conservator.

 Shook stated that it was in G.W.'s best interest for Gray to be appointed possessory
conservator and that it would significantly impair G.W.'s physical health if the trial court
appointed Gray managing conservator. Shook testified that she wanted to be appointed
managing conservator with the right to determine the residence of the child. According to
Shook, if she were not appointed managing conservator, it would significantly impair
G.W.'s physical health because

 [i]f [G.W.] were to be taken away from her residence, the only home she's
ever known, and moved across the country where she has no family, no
support system, I feel--and as an educator and with a degree in counseling,
I feel that it would be--and her grandmother, I feel that it would be harmful
to her because she has a lot of insecurities now.


 On cross-examination, Shook stated that Gray "arrived" after G.W.'s birth and that
he did not participate during the pregnancy and did not pay for the medical expenses
related to G.W's birth. According to Shook, from the time of G.W.'s birth until the time of
trial, Gray had not had contact with G.W. on a monthly basis. Shook stated that Gray has
had approximately three to four visits with G.W. per year in the last five years. Shook
testified that Gray lived in Houston when G.W. was born; he then moved to New Jersey,
then to Denver, Colorado, and then to Seattle, Washington. Shook said that when G.W.
was born, Lucy moved into Shook's home and that for a short time, Gray took an "active
role" and visited G.W. at least every other weekend; however, the visits soon became
"sporadic." 

 Shook testified that G.W. has started pre-school and that G.W. attends gymnastics,
dance class, and play groups with her friends. According to Shook, Lucy usually spends
the night at Shook's house and does not take G.W. away for overnight visits because they
do not want to "jerk [G.W.] back and forth." Shook stated that she does not intend to move
away from Victoria.

 Shook testified that Gray did not acknowledge G.W. as his child while Lucy was
pregnant, but after G.W. was born, a paternity test was performed. Shook stated that
when Gray was transferred to New Jersey, he did not visit G.W. "real often" and that during
that time, G.W. bonded with Shook and Lucy; Shook explained that bonding means
"creating a safe place--a place in the relationship where a child feels safe, unquestionably
taken care of." Shook did not believe that G.W. bonded with Gray during the first year of
her life. She stated that after approximately two years in New Jersey, Gray moved to
Denver; during that time, he visited G.W. two to three times per year. According to Shook,
while Gray has lived in Seattle, he has visited G.W. three to four times per year and that
in the last year, Gray had seen G.W. "[a] little more regularly." When asked, "And if you
were to define her world of comfort, who are the people that are involved in her world of
comfort right now," Shook replied, "My husband, myself[,] . . . her mother[,] and her
[maternal] aunt and her [maternal] uncle." Shook claimed that Gray had not contacted
G.W. by telephone on a regular basis and that to her knowledge, Gray had only called
G.W. once since she was four years old. When asked what the impact on G.W. would be
if she were removed from Shook's home and moved to Seattle, Shook stated:

 It would be devastating at this point in her life. Her world as a five-year-old
revolves around her safety and her security. And she already worries and
obsesses over things because of the insecurity of her dad in and out of her
life. The only thing constant in her life since birth has been my husband and
I and her mother has been there as a presence.


 Shook stated that her "position is [Gray] should see [G.W.] more often, that he
needs to build a relationship and be a full part of her life, not just visit occasionally" and that
it would be "devastating to [G.W.]" if Gray were allowed to transport G.W. to Seattle
because she had "never been more than a night or two without [Lucy], [Shook,] or
[Shook's] husband." According to Shook, no relationship exists between G.W. and Gray;
therefore, Gray's visitation should be increased gradually "until [G.W.] feels safe and
comfortable with him at [the Shooks'] home in Victoria or other places."

 On re-direct examination, Shook stated that although Gray has been interested in
visiting with G.W., "[t]he desire for seeing her more than he has been is sudden as of the
last hearing." Shook believed that if G.W were transported to Seattle, she could suffer
physical harm, such as "stomach [aches], throwing up, grinding her teeth." Shook testified
that the trial court had ordered Gray to visit G.W. three times before the end of the year
2007 because Gray had only visited G.W. once that year and that Gray had complied with
the order. 

 Shook denied that she and Lucy "resisted" allowing Gray any visitation time with
G.W. and that they had "always encouraged [Gray] to be part of her life." When asked to
substantiate her opinion that G.W. would suffer from physical and emotional harm if she
were removed from Shook's home, Shook stated that:

 [c]ounselors other than myself, child counselors that [G.W.] has visited with
that [sic] has told me this and is willing to testify here today. It's not just my
opinion, it's. . . Any adolescent child psychology book that you read, when
you take a child's world away from them, the only world that they know, and
put them in another world has harmful effects. . . . [And G.W.] would not
have family support [if she moved to Seattle]. . . . [Gray] has not one relative
that lives in Seattle. [G.W.] in Victoria has a wide family support system and
that is the most important thing in her life.


The trial court asked Shook several questions regarding Lucy's parental involvement. In
her answers, Shook acknowledged that Lucy does not visit G.W. every day, does not pay
any child support to Shook, and that Shook still provides financial support to Lucy. When
asked why Shook had possession of G.W., Shook replied:

 Lucy suffers from depression, which she is being treated for and sees a
doctor and is trying to get help. She maintains a job fulltime and she
struggles to provide a place where [G.W.] can come. She struggles to
provide a car. She's having a hard time. And she wants to be a fulltime
mother but she feels--and we've always discussed [G.W.] openly between
ourselves--and we feel together that it's better not to drag [G.W.] from one
place to the other. Lucy visits her at our home and she may financially have
to move back into our home with [G.W.].


Shook stated that she believes that G.W. is safer living with her rather than living with Lucy
and that she and her husband have been the "only consistent thing" in G.W.'s life.

 Green, a licensed clinical social worker, (1) testified that she had been counseling
G.W. for two months prior to the trial due to G.W.'s separation anxiety. Green stated that:

 [G.W.] has had several instabilities in her life to date. She's been back and
forth with her biological mother and is currently residing primarily with her
biological grandmother and step grandfather. There's been inconsistencies
due to the mother's difficulties, which have led to some anxieties in this
child's life. She has some separation anxiety, she doesn't like to be alone,
she's very controlling, she's very needy, needs lots of attention. She won't
sleep alone in a room.


 According to Green, stability and consistency are very important to a child
experiencing anxiety. Green explained that a child G.W.'s age is not able to bond with a
person who visits every three to four months and that for bonding to occur, more frequent
contact is necessary. When asked whether it is detrimental to a relationship between a
child and a parent for there to be infrequent or large gaps between visits, Green replied
that it would not affect the relationship in a positive manner and "as far as the two people
bonding together, it's going to keep that from happening." She opined that for a child to
bond to someone, that person must be consistently in the child's life. Green stated that to
achieve that level of bonding, the person should have regular communication with the child
by mail, telephone, or "face-to-face." Green testified that visits once every two months are
inadequate for bonding to occur and that she did not "feel" that G.W. had an adequate
bond with Gray, meaning that G.W. "would sense" Gray as a stranger. Green opined that
bonding could occur if Gray maintained regular communication. Green stated:

 You know, from what I understand, the only time [G.W.] interacts with [Gray]
is when he's here. There's no phone calls, there's no letters, there's no little
pictures sent in the mail, none of those things that would be appropriate
communication with a four-year-old, which is frequent when parents are
geographically distanced, they make the effort to have regular weekly phone
contact or some kind of interaction with a child.


 According to Green, G.W. considers Shook her "primary parent" and she feels
"safe" in Shook's home environment. Green testified that because of G.W.'s separation
anxiety, a situation that causes more stress, such as allowing her to leave her home, could
cause long-term problems such as "[p]oor performance in school, poor socialization,
difficulty in relationships" and more serious problems such as depression and the risk of
drug use. Green explained that extended periods of visitation with Gray in Seattle could
cause G.W. to "regress, she could become increasingly more anxious and more clingy." 
Green stated, "I understand that when she's gone on visits in the past with the father she's
been throwing up out of anxiety, possibly, since it's been a recurring event."

 Green testified that if G.W. was removed from Shook's home, she would "freak out,"
cling to Shook, cry, scream, and throw up. According to Green, if the visitation schedule
"is too accelerated," there could be problems "such as the continued vomiting during visits
. . . bed-wetting . . . anxiety . . . . Maybe even she would become more controlling, more
bossy, which could cause problems with her peer interaction."

 Gray testified that he works for Skansa, USA Building as an engineer and his salary
is $85,000 a year. According to Gray, in the past, there has been "some resistance" to his
visiting with G.W. and that there was difficulty in exercising his last visitation with G.W. 
Gray stated:

 The day prior to me making the trip down here I called Lucy, her
mother--G.W.'s mother, that is--and inquired where and when I could pick
her up, understanding that it was nine, but just to confirm things. And [Lucy]
informed me that her daughter was out of town and didn't know exactly when
she'd return or where she was at that moment but she would call and inquire
into that. And I asked her to finally return my call and let me know what time
the next morning I could pick her up and where that would be.


 A few hours later, seven o'clock my time, nine o'clock here, I was getting
ready to board an overnight plane flight down here and I called back--I've
also called [Shook's] house at that time to see if I could find someone there
that could answer that question. Phone calls were not answered, messages
were left and I never heard back from them.

 

 And the next morning on my way down from Houston in a car, after flying in
there, I made another round of calls with no answers or return messages. 
And then later in that morning I got a call from [Shook], informing me that
they were in Austin or somewhere in that area and that they were thinking
about leaving relatively soon, that they would be down in a few hours.


According to Gray, the visitation that was scheduled to begin at 9:00 a.m. actually began
at 1:30 p.m., and he did not make that time up by returning G.W. later. Gray stated that
his visitation with G.W. went "exceptionally well," they had a lot of fun together and that he
and G.W. have a strong healthy bond and relationship.

 Gray testified that he lives with his girlfriend, Allison, in a house he recently
purchased and that there is a bedroom for G.W. Gray started a college fund for G.W. and
provides health insurance for G.W., which he started doing "immediately following the first
month of [G.W.'s] life." Gray claimed that at the time of G.W.'s birth, it was "very unclear
who the father was" and that was the reason Lucy carried her own medical insurance
during the pregnancy and birth.

 Gray stated that he was requesting custody of G.W. because it had become
increasingly difficult to be as involved in her life as he would like to be. Gray testified that
he had not been aware that G.W. lived with Shook until she filed her petition for
intervention; therefore, when he became aware of the situation, Gray decided that he
should seek custody of G.W. Gray believed that G.W.'s living conditions were temporary
and "evolved out of convenience almost in that Lucy was not taking care of [G.W.] as much
as needed . . . ." He also believed that he could provide for G.W. and nurture and love her
as much as Shook has. Gray stated:

 Lucy's interest in [G.W.'s] upbringing has not been as we would hope as a
parent, and I think that's even gone slightly less over the years and just kind
of withered away. I think as a young mother she's been, you know, reluctant
to give up parts of her life that, you know, are enjoyed by single people and
it's put [G.W.] in an uncomfortable situation there.


 On cross-examination, Gray stated that Lucy had not been willing to provide
financial support and time to G.W. but that he has done so. Gray stated that he lived in
New Jersey for approximately one year and that he would be "hard pressed to recall the
exact number" of times he visited G.W., but thought he saw her every two months on
average. Gray claimed that at that time, it was difficult to contact G.W., and Lucy made
visitation difficult for him by only allowing short, supervised visits with G.W. Gray stated
that when he lived in Colorado, he visited G.W. on average every two months. Gray
testified that he was unable to visit G.W. on a monthly basis because his employer only
allowed ten days of vacation per year and therefore, "[t]here's not that many days in the
year vacationwise to do that." On cross examination by Shook's attorney, Gray testified
that in order to visit G.W. in Victoria, he is required to take at least "three days of vacation
wrapped around a weekend." Therefore, Gray stated, "Ten days of vacation means you
do that three times a year, you've used your vacation for that year." Gray also explained
that it was expensive to make more visits. When asked if he had "telephone visits" with
G.W., Gray replied, "I have in the past had many phone conversations with her. In recent
months phone calls are unanswered, unreturned. Phone records could easily indicate the
hundreds of phone calls tabbed and made." No phone records were admitted into the
record.

 Gray admitted that he decided not to look for employment in Texas although he
believed that he could have found a job there. When asked why he chose not to live in
Texas if his primary consideration was G.W., Gray responded, "I don't believe location is
exclusive of visiting my daughter. Those two things don't have to contradict each other in
any way." Gray explained that moving to Seattle would allow him more visitation time with
G.W. because he made more money and he would never be asked to relocate from
Seattle. According to Gray, if G.W. moved to Seattle to live with him, due to the flexibility
of his work schedule, he could on certain occasions work from home and would be able
to transport G.W. to and from her school.

 Gray stated that the reason he could not visit with G.W. more than once every two
months is due to her inability to leave Victoria. Gray thought that it would have been better
if G.W. had been allowed to travel by plane to visit him in addition to his visits to Victoria. 
According to Gray, for "close to three years," he attempted to negotiate with Lucy a plan
for G.W. to visit him. Gray explained, "I was hoping that we could eventually work
something out that was mutually agreeable. Eventually communications have broken
down to the point that phone calls are unreturned, unanswered, and they were unbending
in their requests and demands." Gray acknowledged that "[v]isitation was highly
restrained, but as a mature, responsible parent [he] always hope[d] and [his] goal was that
[he and Lucy] could work out some mutually agreeable terms and conditions of that."

 According to Gray, his bond with G.W. is "very strong," but because of the recent
"extraordinarily strained" relations, contact with G.W. has not been permitted. Gray
testified that when he visited with G.W., she did not demonstrate any behaviors indicating
that she was suffering from separation anxiety. Gray stated, "Regarding her getting sick,
she's gotten sick one time in my presence. During my last visit I picked her up from dance
and she was ill on the way home in the car and recovered within the hour and was playing
again." Gray testified that he picked G.W. up at Lucy's residence "a number of times" and
also from Shook's residence for visitation. Gray stated that it had been "less than a year"
since he picked G.W. up at Lucy's residence.

 Gray claimed that he was unaware that G.W. resided with Shook and that his "family
[in Victoria] didn't know." When asked, "How hard do you think it would have been had you
looked to figure out where the child was living," Gray responded, "How hard would it have
been had I looked? I looked as far as I could; that is, she clearly maintained two
residences. That is, all of her toys were both at [Lucy's] house and she had a lot of toys
at [Shook's] house. As recently as yesterday, for example, [G.W.] stated I live with
[Shook]. Oh, I'm not supposed to say that."

 Shook's trial counsel asked Gray if he agreed with Green's testimony that it was not
in G.W.'s best "interest to be uprooted and moved to Seattle." Gray replied, "I don't sir, in
that I believe that she's in a damaging and destructive environment currently and that
currently her care is loving and nurturing but a little bit over controlling and possessive in
a way that may lead to some of these issues." During re-cross examination, Shook's
counsel asked, "Would that be in [G.W.'s] best interest to remove her that distance from
the people that have taken care of her during the first five years of her life," Gray replied:

 Taken care of her, I don't really accept how you use the phrase, but I believe
it would be in her best interest. They've cared for her and I greatly
appreciate what they have done to provide the temporary solution they have. 
That as a more permanent solution I see her living with one of her parents,
and that would be myself if the mother is not taking care of her, which has
been the case. So, I believe that it would be in my daughter's best interest
to reside with me in Seattle.


When asked if Gray believed he had "stepped up to the plate and assumed the
responsibility a parent should," Gray responded,

 Yes, I have stepped up to the plate in that I have consistently been in her life. 
As soon as I had any indication she wasn't living with her biological parent,
I pressed for this, right? That's why we're here today, is because I have
been trying to step up to the plate and seek more and more time with G.W.
since the day she was born, while they have pushed very hard back against
that.


 Gray claimed that immediately after G.W. was born, he initiated some action, which
he did not explain, in order to assert his parental rights. Shook's attorney stated, "You
haven't done anything to establish rights to possession and access to medical records and
to school records, you haven't done any of those things until you filed this lawsuit." Gray
replied, "That's not true in that, as stated, right after she was born we sought all those
things which you just discussed and . . . ." When Shook's counsel asked Gray to produce
the court orders establishing those rights, Gray said, "We could pull them up. There were
court orders, there were attorneys involved the month after she was born involving just
what you're discussing, sir." Lucy's trial counsel then asked the trial court to take judicial
notice of the fact that the pending action was the only suit affecting the parent-child
relationship that had been initiated and that it was not filed one month after G.W. was born. 
Gray then stated, "That's correct, it never reached--it never reached the court at that point,
we were negotiating between the attorneys and it was, like I said, a standard parental--I
forget the right term for it right now--but acknowledgment of parent, that sort of thing that
we went through at that time."

 Lucy testified that G.W. lives with Shook and has lived at the Shook residence for
approximately one year. Lucy stated that she and Shook decided to share the parental
responsibilities because Lucy "needed help raising" G.W. According to Lucy, she was
diagnosed with depression when she was in eighth grade, and since then, she has been
taking medication for that disease. After G.W. was born, Lucy moved in with Shook and
lived there two or three years. Lucy stated that she believes that it is in G.W.'s best
interest to continue living with Shook and that she is available to participate in raising G.W.

 Lucy denied that she ever prevented Gray from visiting with G.W. and claimed that
she "encouraged" him to visit regularly and more often. Lucy stated that it would be better
for G.W. if Gray had more contact with her. Lucy also denied that she ignored Gray's
telephone calls. Lucy explained that the "supervised" visits occurred when she was breast
feeding G.W., which she did for "a little over a year." Therefore, it was "necessary" for her
to be present during those visitations. Lucy testified that she did not want to prevent Gray
from having visits with G.W. and that she believes it is "very important" for G.W. to visit
Gray.

 Lucy stated that G.W. was "around" two when Gray moved to New Jersey and that
she was not aware of any requests from Gray for G.W. to be flown to New Jersey for a
visit. Lucy testified that she has concerns about allowing G.W. to fly to Seattle because
she suffers from separation anxiety and she would be scared due to her young age. Lucy
agreed that she would work with G.W. to help her overcome her anxiety. However, Lucy
did not believe that it would be in G.W.'s best interest for Gray to be appointed sole
managing conservator and that it was in G.W.'s best interest to continue living with Shook.

 On cross-examination, Lucy said that it was not true that Gray had placed hundreds
of telephone calls to G.W. Rather, she testified that before the suit was filed, Gray called
approximately twice a month to talk to G.W. Lucy stated that Gray visited G.W. two or
three times per year, usually during a holiday like Christmas or Thanksgiving. When asked
why Gray did not visit more often, Lucy replied, "I guess numerous reasons, being the
expense, the travel expense. Other plans. For example, he had a four-or five-day trip
down to Texas over New Year's Eve once and was only in Victoria two days out of that
time, the other three days he spent in Austin or Dallas with friends." Lucy believed that
Gray's infrequent visits have "damaged" his relationship with G.W.

 The trial court appointed Shook managing conservator with the right to determine
G.W.'s residence and appointed Gray and Lucy possessory conservators. The trial court
ordered that neither possessory conservator live in the same residence with G.W. and
Shook. The trial court entered findings of fact and conclusions of law, which stated in
pertinent part:

 4. The Court finds that at the time of filing of the Petition in Intervention,
Intervenor [Shook] had actual care, control, and possession of the
child made the subject of this suit for more than six months ending no
more than 90 days preceding the date of filing of the Petition in
Intervention.

 

 5. The Court finds that it is in the best interest of the child made the subject of this suit that [Shook] be appointed Sole Managing Conservator of the child made the subject of this suit.

 

 6. The Court finds that it is in the best interest of the child made the subject of this suit that [Gray] be appointed possessory conservator
of the child made the subject of this suit.

 

 7. The Court finds that appointment of [Gray] as joint managing conservator of the child made the subject of this suit would not be in
the best interest of the child made the subject of this suit because the
appointment would significantly impair the child's physical health or
emotional development.


 Gray requested additional findings of fact "on how appointment of a parent or the
parents as sole or joint managing conservator in the instant case would significantly impair
the child's physical health or emotional development, including, what facts, if any, in the
record, support said findings." The trial court did not make any additional findings of fact,
and this appeal ensued.

II. Standard of Review and Applicable Law

 An appellate court reviews the determination of conservatorship under an abuse of
discretion standard. Whitworth v. Whitworth, 222 S.W.3d 616, 622-23 (Tex. App.-Houston
[1st Dist.] 2007, no pet.) (op. on reh'g) (citing Gillespie v. Gillespie, 644 S.W.2d 449, 451
(Tex. 1982)). "Under an abuse-of-discretion standard, legal and factual insufficiency are
not independent grounds of error, but rather are relevant factors in assessing whether the
trial court abused its discretion." Baltzer v. Medina, 240 S.W.3d 469, 475 (Tex.
App.-Houston [14th Dist.] 2007, no pet.); see also Morris v. Morris, No. 13-05-00297-CV,
2007 Tex. App. LEXIS 5878, at **6-7 (Tex. App.-Corpus Christi July 26, 2007, no pet.)
(mem. op.). The trial court abuses its discretion if its decision is arbitrary or unreasonable. 
 Whitworth, 222 S.W.3d at 623. A trial court may also abuse its discretion if it fails to
analyze or apply the law correctly. In the Interest of C.A.M.M., 243 S.W.3d 211, 215 (Tex.
App.-Houston [14th Dist.] 2007, pet. denied) (citing Walker v. Packer, 827 S.W.2d 833,
840 (Tex. 1992) (orig. proceeding)). The trial court does not abuse its discretion if there
is some evidence of a substantive and probative character to support the decision. 
Whitworth, 222 S.W.3d at 623.

 "The presumption that the best interest of a child is served by awarding custody to
a natural parent is deeply embedded in Texas law." Lewelling v. Lewelling, 796 S.W.2d
164, 166 (Tex. 1990). Therefore, section 153.131 of the family code requires that the
parent be appointed sole managing conservator or both parents be appointed joint
managing conservators unless the nonparent proves by a preponderance of the credible
evidence that "appointment of the parent or parents would not be in the best interest of the
child because the appointment would significantly impair the child's physical health or
emotional development . . . ." Tex. Fam. Code Ann. § 153.131 (Vernon 2008); In re De La
Pena, 999 S.W.2d 521, 527 (Tex. App.-El Paso 1999, no pet.). The family code's
presumption in favor of parental custody places a "heavy burden on a nonparent seeking
custody." May v. May, 829 S.W.2d 373, 376 (Tex. App.-Corpus Christi 1992, writ denied). 
To rebut the presumption, "the evidence must support a logical inference that some
specific, identifiable behavior or conduct of the parent will probably cause significant
physical or emotional harm to the child." Id. at 377. Any "close call" must be resolved in
favor of the parent over the nonparent. Chavez v. Chavez, 148 S.W.3d 449, 459 (Tex.
App.-El Paso 2004, no pet.). 

III. Analysis Shook relies heavily on Green's testimony that G.W. had suffered from separation
anxiety and that because she had not bonded with Gray, it would not be in her best interest
to move to Seattle. If the evidentiary burden on a nonparent was any evidence of any
harm to the child, we would be required to find that the trial court acted within its discretion
in this case. However, as we discuss below, the law requires the evidence to rise above
mere speculation of harm, and further requires the harm to be attributable to a specific,
identifiable act or omission of the parent. The trial court abused its discretion, and
therefore, we sustain Gray's sole issue, because: (1) Shook failed to offer any evidence
of a specific, identifiable act or omission by Gray that would be likely to harm G.W; and (2)
the evidence of the general harm caused by "uprooting" in this case is only speculative and
therefore could not rebut the parental presumption. 

A. Specific, Identifiable Act or Omission 

 Gray contends that the trial court abused its discretion because the record does not
legally--or even factually--demonstrate specific acts or omissions by Gray that would
significantly impair the physical health or emotional development of G.W. We agree.

 In order for a nonparent to overcome the presumption that it is in the child's best
interest to be in the custody of a parent, there must be evidence of "specific, identifiable"
conduct by the parent that is likely to cause harm to the child's physical health or emotional
development. (2)
 In May v. May, this Court wrote that the family code

 requires evidence of specific actions or omissions of the parent that
demonstrate an award of custody to the parent would result in significant
physical or emotional harm to the child . . . . In other words, the nonparent
must usually present evidence affirmatively showing conduct of the parent
which will have a detrimental effect upon the child, such as physical abuse,
severe neglect, abandonment, drug or alcoholic abuse or very immoral
behavior on the part of the parent.


829 S.W.2d 373, 376-77 (Tex. App.-Corpus Christi 1992, writ denied) (citing Lewelling v.
Lewelling, 796 S.W.2d 164, 167 (Tex. 1990)). In May, we ultimately held that the father
could not retain custody of the children, but that holding was based on the fact that the
father had been a drug user in the recent past, and the holding was only made after a
careful and deliberate finding of a specific, identifiable act of the parent that would
significantly impair the child's physical health or emotional development. See id. at 377-79. 

 In Lewelling, the Texas Supreme Court emphasized the portion of the statute under
which a nonparent may obtain custody if "the court finds that appointment of the parent or
parents would not be in the best interest of the child because the appointment would
significantly impair the child's physical health or emotional development." Lewelling, 796
S.W.2d at 166 (emphasis in original). After emphasizing this specific language, the court
instructed that:

 The [statutory] language requiring a showing that appointment of the parent
would significantly impair the child's physical or emotional development
creates a strong presumption in favor of parental custody and imposes a
heavy burden on a nonparent. It is no longer adequate to offer evidence that
the nonparent would be a better custodian of the child . . . . [T]he nonparent
must affirmatively prove by a preponderance of the evidence that
appointment of the parent as managing conservator would significantly
impair the child, either physically or emotionally. This statute thus requires
the nonparent to offer evidence of specific actions or omissions of the parent
that demonstrate an award of custody to the parent would result in physical
or emotional harm to the child.


Id. (internal citations omitted) (emphasis added). Absent evidence of some specific act
or omission by Gray that would cause G.W. harm, the parental presumption can not be
overcome. We find no such evidence in the record.

 The evidence in this case shows that the only possible harm to the child is the
"uprooting" itself--not any specific, identifiable act or omission, conduct or behavior of
Gray. Therefore, it was an abuse of discretion for the trial court to name Shook, a
nonparent, sole managing conservator of G.W.

B. Speculative Harm

 Furthermore, even if we look at general harm, not attributable to Gray's specific acts
or omissions, Shook failed to present any evidence that could overcome the parental
presumption because the evidence presented raises only speculative harm.

 In May, this Court wrote that "[the] harm to the child . . . may not be based on
evidence which raises a mere surmise or speculation of possible harm." May, 829 S.W.2d
at 377 (citing Kindred v. Con/Chem, Inc., 650 S.W.2d 61, 63 (Tex. 1983); Briones v.
Levine's Dept. Store, Inc., 446 S.W.2d 7, 10 (Tex. 1969)). 

 Shook essentially relies on one theory of harm in order to justify the trial court's
judgment that Shook had overcome the parental presumption. That theory can be
summarized as follows: (1) Green testified that G.W. suffers from "some" separation
anxiety; (2) this anxiety has caused "recurring vomiting" in the past, could effect her peer
relationships in the future, and may lead to other long-term problems; and (3) these harms
can be prevented if G.W. remains with Shook because G.W. feels safe with Shook and
G.W. has not bonded with Gray.

 Evidence of sporadic, past vomiting and the possibility of negative effects on peer
relationships is insufficient evidence to rise above a mere speculation of harm. The record
indicates that vomiting had occurred on only one or two occasions out of the dozens of
times G.W. has met with her father, and on closer review of the record, Green testified that
the vomiting was "possibly" caused by anxiety. Moreover, there is no evidence that all of
the other alleged dangers to G.W.'s emotional development were more than a mere
possibility. For example, on direct examination, when asked, "Can you give the Court
some example[s] of what some of those additional problems might be[?]," Green
responded, "sometimes depression develops, sometimes they're at risk for drug use," and
further responded, "oftentimes we see long-term problems." (Emphasis added). These are
the exact types of speculative harms that we prohibited from consideration in May. See
May, 829 S.W.2d at 377. Without consideration of this speculative harm, there is no
evidence whatsoever to rebut the parental presumption. Therefore, again, we hold that the
trial court abused its discretion in appointing Shook, a nonparent, as G.W.'s sole managing
conservator.


IV. Conclusion

 Because we hold that the trial court abused its discretion by appointing Shook to be
G.W.'s sole managing conservator, we sustain Gray's sole issue. Having failed to meet
her burden, Shook may not maintain any legal custodial rights over G.W. "In most
circumstances, a judgment is reversed and rendered when a legal sufficiency challenge
is sustained." Chavez, 148 S.W.3d at 461. However, we are permitted to remand a case
such as this "when the interest of justice so requires." Id. (citing Tex. R. App. P. 43.3). In
this case, the trial court held in Shook's favor, making it unnecessary for that court to
determine G.W.'s best interest as it related to the custodial or visitation rights that should
exist between Gray and Lucy only. Because of this, and because we have overturned the
trial court's ruling designating Shook as sole managing conservator, we find it to be in the
interest of justice not to simply render judgment in Gray's favor. Further, more than a year
has passed since the custodial hearing; circumstances may have changed during this time
such that it would not be in G.W.'s best interest to appoint Gray as her sole managing
conservator, and we have no ability to determine the present circumstances of any of the
parties, nor do we have the luxury of sitting as a fact-finder. For the forgoing reasons, we
remand this case to the trial court for custodial hearings to determine the rights as between
Gray and Lucy only.

 ______________________________

 GINA M. BENAVIDES,

 Justice

 

Dissenting Opinion by

Justice Linda Reyna Yañez.



Delivered and filed the

30th day of November, 2010.
1. There is no evidence that Green had obtained a medical degree, and she did not claim to be a
psychologist or psychiatrist.
2. The dissent cites three cases from our sister courts to support the proposition that a nonparent may
be awarded custody even without a blameworthy act of the parent. Each of those cases is distinguishable
from the present case, and moreover, the precedent in those cases is not binding on this Court.

 First, in In re G.R.W., the Texarkana Court was dealing with circumstances much different from those
in this case. 191 S.W.3d 896, 898-900 (Tex. App.-Texarkana 2006, no pet.). In that case, the father of the
child had been indicted for sexual assault of the mother for the very sexual encounter that led to the birth of
the child, and the father was convicted of the lesser offense of child endangerment. Id. at 898. Moreover,
the court pointed to the fact that the father was a smoker and that the child had severe respiratory problems. 
Id. at 900-01. These facts establish specific, identifiable acts of the parent that would be likely to impair the
physical health or emotional development of the child. Further, there is no indication that the Texarkana Court
relied on the proposition that a nonparent may be awarded custody of a child without a blameworthy act of the
parent; the opinion seems to merely state this proposition in dicta. See id. 

 Second, in In re Rodriguez, the facts are again distinguishable in a meaningful way from the present
case. 940 S.W.2d 265, 266-70 (Tex. App.-San Antonio 1997, writ denied). In that case, the birth mother
gave the child up for adoption and relinquished all parental rights, and the father had met the child only twice
in the child's life. Id. at 267-69. Moreover, there was evidence presented that all interactions and visitations
were initiated and facilitated by the child's paternal grandmother, not by the father himself indicating a lack
of concern for the child, especially in the child's early life, which the evidence does not support in this case.
Id. at 269-70. Additionally, the majority for the San Antonio Court wrote that it didn't believe that "[section]
153.131, Texas Family Code contemplates that the environment which 'significantly impairs the child's
physical health or emotional development' must be the product of some act or omission on the part of the
natural parent," which we consider to be a blatant misstatement of the law. We concur with Justice Carr's
dissent insofar as it applies to this case. In response to the majority, Justice Carr wrote: 


 [W]hile I agree with the majority that our record reflects "that there is no evidence that any
act or omission, behavior, or conduct by [the father] will impair [the child]," I respectfully
dissent because, unlike the majority, I do not agree that this case is a case of first impression
nor distinguishable from Lewelling v. Lewelling, 796 S.W.2d 164 (Tex. 1990). I would hold
on this legal issue that Lewelling is controlling; and, that at the present time [and] under the
current state of Texas laws, the Lewelling standard that non-parents seeking custody here
cannot benefit from their bonding or attachment with the child by "offering it as some
evidence of significant impairment to [the child]." Id. at 168. Accordingly, because [the
nonparent's] significant impact argument was rejected by our Supreme Court in Lewelling,
we are required to reject the same argument here.


Id. at 275 (Carr, J., dissenting).

 Third, in Chavez v. Chavez, the mother who was seeking to reacquire custody was shown to be a
drug user and there was evidence that she was physically abusive. 148 S.W.3d 449, 453 (Tex. App.-El Paso
2004, no pet.). The El Paso Court overturned the trial court's ruling against the mother on other grounds and
never actually reached the issue of whether these specific, identifiable acts or some other reason would
prevent the mother from maintaining custody of the children. Id. at 459. If the dissent agrees with the
reasoning in Chavez, it should at least recognize the present case as a "close call," and settle any doubt in
favor of the parent, as the El Paso Court required. See id.