02-10-2620-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

NO. 02-10-00260-CV

 

 


 
 
 In the Interest of C.M.C., 
 a Child
 
 
  
 
 
  
 
 
 
 
  
 
 
 
 
  
 
 
  
 
 
  
 
 


 

----------

 

FROM THE 158th
District Court OF Denton COUNTY

----------

 

MEMORANDUM
OPINION[1]

----------

 

I.  Introduction

          Appellant
Father appeals the trial court’s order appointing Stephen Hall, a nonparent and
nonrelative, as sole managing conservator of Father’s son, C.M.C.[2]  Mother, who is
not a party to this appeal, was awarded possession the first and fifth weekend
of every month, and Father was awarded possession the third weekend of every
month, along with other possession at spring break, Thanksgiving, and Christmas
break.  Father raises two main issues, challenging the appointment of Hall as
sole managing conservator of C.M.B. and challenging the possession order.  We
will affirm.

II.  Factual
and Procedural Background

C.M.B.
was born two months premature on June 9, 2002 in Fort Worth.  When C.M.B.
gained weight and was released from the hospital, Mother and Father brought him
home to live with them.  C.M.B. later went to live with Hall and
Vickie Murphy, who was Mother’s sister.  The record contains conflicting
testimony about when C.M.B. went to live with Hall and Murphy and whether C.M.B.’s
biological parents intended for Hall and Murphy to care for C.M.B.
indefinitely.

A.      Hall’s
Testimony

Hall
testified at the hearing that he had cohabitated for at least twenty years with
Murphy and that he and Murphy went to see C.M.B. when he was a preemie in the
hospital.  While C.M.B. was living with Mother and Father, they hooked up a
propane gas tank to a hot water heater and caught the house on fire.  C.M.B.
was in the house at the time of the fire.  Hall
believed that C.M.B.’s parents were using drugs and that there was abuse based
on Father’s criminal background and the area that they were living in. 

When
C.M.B. was a little over a year old, he went to live with Hall and Murphy because
C.M.B.’s parents were homeless.  Hall later clarified that Murphy went to pick
up C.M.B. when Mother and Father went to jail because of a family dispute.

Around
2006, after C.M.B. had been living with Hall and Murphy for approximately three
years, Murphy went to court to formalize her custody of C.M.B.  After
Murphy went to court to get custody of C.M.B., Mother started visiting and
asking for C.M.B. to stay with her.  Approximately
once a month, Mother called and wanted to see C.M.B.  Murphy took C.M.B. to visit
Mother whenever she asked.

In
2009, Murphy died while C.M.B. was home with her.[3]
 Hall took care of C.M.B. after Murphy died and was substituted in the custody
suit in place of Murphy.  Hall testified that he has always made sure that
C.M.B. is fed and clothed and medically cared for.[4]
 Hall
said that he had enlisted several different women to care for C.M.B. after
school and when Hall was out of town.  At the time of the conservatorship hearing,
Hall’s daughter-in-law and her three-year-old son were living with him, and his
daughter-in-law was helping care for C.M.B.

Hall
testified that C.M.B. is happy and does well in Hall’s care.  C.M.B. is a
special needs child who rides a special needs bus to a special needs school.  His
class has five or six students and three teachers.  He has been diagnosed with
anger management issues and ADHD and has a hard time studying.  Hall testified
that he does not have insurance for C.M.B. because “it’s just very difficult
and very expensive” since he is a special needs child, but Hall has paid all of
C.M.B.’s medical bills.

Hall
said that Mother had lived “a lot of different places” and that Mother’s home
was not a very good atmosphere for C.M.B. to be in.  Hall testified that he fears
for C.M.B.’s safety when he is at Mother’s house.  Once while C.M.B. was
visiting Mother, he was bitten by a pit bull that was chained to the back
porch.  Hall assumed that C.M.B. was fed when he was at Mother’s and that she
looked after him “[t]o the best of [her] ability.” 

Hall
noted that C.M.B. becomes upset and angry before and after he visits with
Mother, that he curses upon his return from a visit, and that his grades drop.  Hall
said that it usually takes a week for C.M.B. to get back on track after a visit
with Mother, and then he starts making hundreds and nineties again.  Hall said
that C.M.B. kicks and fights and does not want to talk to Mother when she
calls.  Hall has to hold him.

Hall
ran criminal background checks on Father and Mother and saw that Father had
been in prison for seven years and that Mother had DWIs and family disputes on
her record.  Hall said that Mother has a problem of being in abusive
relationships; he has seen her with a tooth knocked out, black eyes, and a hurt
wrist.

Hall
understood that Father was living with Father’s mother, agreed that her house
was “fairly nice, decent,” and noted that she was a good influence on C.M.B.  Hall
said that he and the grandmother have a “fairly good relationship for the child,”
that they had worked out a schedule so that C.M.B. could stay with her, and
that C.M.B. went to the grandmother’s house fairly regularly.  Hall felt safe
when the grandmother watched C.M.B., and he returned “happy” and “nice.” Hall
said that C.M.B. enjoyed himself at his grandmother’s house and would plant
things and play.  C.M.B.’s grandmother had him over for a visit during
Christmas vacation and brought him back on Christmas Day.  She gave Hall a
check for $300, which he assumed was for child support, and a $100 bill for C.M.B.
for a Christmas present.  This was the first time Hall had received child
support.  C.M.B. called Father and his grandmother the night before the 2009
conservatorship hearing.

Hall
testified that he wanted C.M.B. to visit with his family as much as possible but
that it would not be in C.M.B.’s best interest to move out of Hall’s home.  Hall
said that his work schedule does not impede C.M.B.’s ability to flourish
because he gets special needs help from professionals, psychologists, and professional
teachers; “[h]e’s getting all kind of help that I can provide for him.”  Hall
asked for full care, custody, and control of C.M.B. even though C.M.B. is not
his child because Hall loves him and has cared for him almost his whole life. 

B.      Mother’s
Testimony

Mother
testified that she and Father broke up after a couple of years because they
were not getting along, and according to Mother, C.M.B. lived with her in 2003
and 2004.  Mother said that C.M.B. was receiving Medicaid through her.  Mother
admitted that she and Father fought and ended up going to jail[5]
and that Murphy came and picked up C.M.B.  Mother, however, denied having ever
been homeless  and said that she never let C.M.B. live with Hall; she went to
get him “on occasions.”

Mother
admitted that C.M.B. was difficult during her initial visits with him but that
other times “he would be so happy.”  C.M.B. acted out and cursed and kicked,
but he also acted at times like a sweet, caring, young boy. 

Three
years prior to the trial, Mother married Jeff Henry and bought a two-bedroom
mobile home in Kennedale.  C.M.B. had his own room and his own bathroom.[6]
 She said that there was food in the pantry and that the house was clean.  Mother
said that there was no drug use in the house and that she had never “cooked
dope.”

Mother
said that her personal income was zero and that she was supported by her
husband.  At the time of the hearing, Mother was planning to get a part-time
job.  Mother admitted that she had never paid child support and had never given
Hall money for C.M.B.’s school expenses, but she had tried to prove her fitness
as a parent by attending parenting classes on her own and by taking two drug
tests and passing them. 

C.      Mother’s
Husband’s Testimony

Mother’s
husband, Jeff Henry, testified that he had been married to Mother for three
years.  Henry admitted that he had been arrested in 1987 for methamphetamines
and had been sentenced to eight years in the penitentiary. Henry was also
convicted of DWI in 2002.  After the DWI and before he met Mother, he “got
[his] life together” and “quit doing drugs.”  He passed the drug tests that he
took while the conservatorship case was pending.

Henry
said that he treats C.M.B. like a son.  Henry said that C.M.B. did not live at
the Hall residence; instead, Murphy and Hall had often called because they
wanted to see C.M.B. 

D.      Grandmother’s
Testimony

Lynda
Bisbey, who is Father’s mother and C.M.B.’s grandmother, testified that she
owns a double-wide mobile home in Fort Worth[7] and that Father lives
with her.  At the time of the conservatorship hearing, Bisbey was unemployed and
was looking for employment; to pay her bills, she relied on support that she
received from an inheritance.

Bisbey
testified that C.M.B. has never lived with her but that he has visited her
house “probably once a month, maybe, or every couple of months.”  Bisbey said
that she picked up C.M.B. from Mother’s house or Mother brought him to her;
Bisbey never picked up C.M.B. from Hall’s house.  Bisbey was under the
impression that C.M.B. lived with Mother.

Bisbey
believed that Father would move out of her house and would rent a place of his
own once he became gainfully employed and could pay bills and daycare.

E.      Friend’s
Testimony

Vicki
Smith, who was Murphy’s best friend, testified that she met C.M.B. when he was
two and was “very disturbed” because he exhibited troubling behavior.

Smith’s
understanding was that Mother had a long-term drug problem, and Smith also
suspected that there was physical violence at Mother’s house.  Smith met Mother
when she was dropping off C.M.B. at Hall’s.  Smith’s interactions with Mother
were “very much reflective of somebody who really did not -- was not attempting
to be adult.”  Smith had also spoken with Mother on the phone and had gathered
that she was not the kind of person who could stay on task or have a reasonable
conversation.  Smith testified that she thought C.M.B.’s exposure to Mother’s
environment and Mother’s conversation adversely affected his behavior.  Smith
said that C.M.B. did not like going to visit his Mother.  After C.M.B. returned
to Hall’s home following a visit with Mother, C.M.B. acted out violently, hit
adults, cussed incessantly—including calling Smith a “b[----]”—and told
everyone around that he hated them.

Smith
had less knowledge about Father because she had seen him in person only twice.  She
stated,

I think what I have
observed that C.M.B. does quite well with him.  I have always thought he was a
caring person.  I never felt that C.M.B. was threatened like I did -- you know,
his safety -- his physical safety like I did when he was at [Mother’s].

 

I don’t think that
C.M.B.’s biological father has the tools to really provide and attend to his
special needs concerns. 

 

Smith
said that when C.M.B. returned from visits with Father, he appeared to have had
a pleasant experience and did not exhibit the same issues as after a visit with
Mother.

Smith
testified that she had not seen Hall’s participation decrease after Murphy
died; he continued to attend ARD meetings at the school to find out the game
plan for C.M.B.’s educational process.  Smith testified that she had never seen
C.M.B. malnourished or dirty while Hall has cared for him, nor had C.M.B.
exhibited signs of physical or emotional abuse while in Hall’s care.  She
said that Hall was a very good father figure/parent figure for C.M.B.  Hall was
involved and wanted to understand how to handle C.M.B.’s behavioral problems
and what his educational process requires.  Smith recommended that Hall
be appointed as the permanent father of C.M.B. because Hall is stable and
loving and is extremely dedicated to caring for C.M.B.

F.       Trial
Court Disposition

After
hearing the above testimony and reviewing the record, the trial court stated
that he believed that Hall had carried his burden.  The trial court thereafter
signed an order appointing Hall as sole managing conservator of C.M.B. and
giving Mother possession the first and fifth weekend of every month and giving
Father possession the third weekend of every month, along with other possession
at spring break, Thanksgiving, and Christmas break.[8]
 The trial court later made findings of fact, which are set forth below, and
this appeal followed.

III.  No Abuse
of Discretion Shown in Appointing Nonparent Conservator

          In
his first issue, Father argues that the trial court abused its discretion by
appointing as C.M.B.’s sole managing conservator Hall in lieu of Father. Specifically,
Father argues that the trial court abused its discretion in making the
conservatorship appointment because several findings of fact were not supported
by the evidence, Hall relied on others to do his parenting, Hall did not have
consistent parenting help, and Father could provide a nice home for C.M.B.

          A.      Standard
of Review

          We
give wide latitude to a trial court’s decision on custody, control, possession,
and visitation matters.  Earvin v. Dep’t of Family & Protective Servs.,
229 S.W.3d 345, 350 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (citing Gillespie
v. Gillespie, 644 S.W.2d 449, 451 (Tex. 1982)).  We will not reverse a
conservatorship finding unless the record demonstrates that the trial court
abused its discretion.  See In re J.A.J., 243 S.W.3d 611, 616 (Tex.
2007); Whitworth v. Whitworth, 222 S.W.3d 616, 622–23 (Tex. App.—Houston
[1st Dist.] 2007, no pet.) (op. on reh’g).  Under an abuse of discretion
standard, challenges to the legal and factual sufficiency of the evidence are
not independent grounds of error; rather, they are simply factors in assessing
whether the trial court abused its discretion.  Gardner v. Gardner, 229
S.W.3d 747, 751 (Tex. App.—San Antonio 2007, no pet.).

In
determining whether there has been an abuse of discretion because the evidence
is legally or factually insufficient to support the trial court’s decision, we
engage in a two-pronged inquiry:  (1) Did the trial court have enough
information upon which to exercise its discretion; and (2) did the trial court
err by applying its discretion?  The traditional sufficiency review comes into
play with regard to the first question.  In re W.M., 172 S.W.3d 718, 725
(Tex. App.—Fort Worth 2005, no pet.); In re T.D.C., 91 S.W.3d 865, 872
(Tex. App.—Fort Worth 2002, pet. denied).  With regard to the second question,
we determine, based on the elicited evidence, whether the trial court made a
reasonable decision.  W.M., 172 S.W.3d at 725; T.D.C., 91 S.W.3d
at 872.

          Findings
of fact entered in a case tried to the court have the same force and dignity as
a jury’s answers to jury questions.  Anderson v. City of Seven Points,
806 S.W.2d 791, 794 (Tex. 1991).  The trial court’s findings of fact are
reviewable for legal and factual sufficiency of the evidence to support them by
the same standards that are applied in reviewing evidence supporting a jury’s
answer.  Ortiz v. Jones, 917 S.W.2d 770, 772 (Tex. 1996); Catalina v.
Blasdel, 881 S.W.2d 295, 297 (Tex. 1994).  When
findings of fact are filed and are unchallenged, they occupy the same position
and are entitled to the same weight as the verdict of a jury; they are binding
on an appellate court unless the contrary is established as a matter of law or
there is no evidence to support the finding.  McGalliard v. Kuhlmann,
722 S.W.2d 694, 696 (Tex. 1986); Rischon Dev. Corp. v. City of Keller,
242 S.W.3d 161, 166 (Tex. App.—Fort Worth 2007, pet. denied), cert. denied,
129 S. Ct. 501 (2008).

          B.      Parental
Presumption

          There
is a strong presumption that the best interest of a child is served if a
natural parent is appointed a managing conservator.  Whitworth,
222 S.W.3d at 623; see also Tex. Fam. Code Ann. § 153.131(a)
(Vernon 2008).  Section 153.131 provides that a parent shall be appointed sole
managing conservator unless the court finds that appointment of the parent or
parents would not be in the best interest of the child because the appointment
would significantly impair the child’s physical health or emotional development. 
Tex. Fam. Code Ann. § 153.131(a).

          For
the court to award managing conservatorship to a nonparent under section
153.131, the nonparent must prove a significant impairment by a preponderance
of credible evidence.  Whitworth, 222 S.W.3d at 623; see also Tex.
Fam. Code Ann. § 105.005 (Vernon 2008) (“Except as otherwise provided by
this title, the court’s findings shall be based on a preponderance of the
evidence.”); J.A.J., 243 S.W.3d at 616.  There must be evidence to
support the logical inference that some specific, identifiable behavior or
conduct of the parent will probably cause that harm.  Whitworth, 222
S.W.3d at 623.  Indeed, the nonparent must offer evidence of specific acts or
omissions of the parent that demonstrate that an award of custody to the parent
would result in physical or emotional harm to the child. Lewelling v.
Lewelling, 796 S.W.2d 164, 167 (Tex. 1990); Whitworth, 222 S.W.3d at
623.

          An
adult’s future conduct may be somewhat determined by recent past conduct;
however, evidence of past misconduct, in and of itself, may not be sufficient
to show present unfitness.  Whitworth, 222 S.W.3d at 623.  Specific acts
or omissions of a parent implicating a significant impairment to a child’s
emotional development may be inferred from direct evidence.  Id. 
However, this link between the parent’s conduct and harm to the child may not
be based on evidence that merely raises a surmise or speculation of possible
harm.  Id. 

          C.      Evidence
of Significant Impairment

          Here,
the trial court made fifteen findings of fact based on the testimony at trial:

Findings of Fact –
Suit Affecting Parent Child Relationship (SAPCR)

 

          1.       Vickie
Annette Murphy, biological Aunt of [C.M.B.], was the original Petitioner. 
However, Ms. Vickie Annette Murphy passed away on January 7, 2009.  She was
succeeded as Petitioner by her husband and current Petitioner Stephen Hall. 
Respondent [Mother] is the biological mother of the Minor Child.  Respondent
[Father] is the biological father of the child.  [Mother] and [Father] are not
married and do not live together at this time.

 

          2.       At
the time of the filing of his Supplemental Petition, Stephen Hall had been a
domiciliary of Texas for six months and a resident of Denton County for ninety
days.

 

          3.       This
suit was brought by Petitioner Stephen Hall seeking to be awarded custody of
the Minor Child.  Additionally, Petitioner Stephen Hall seeks child support,
medical reimbursement and clarification of custody and visitation issues.

 

Findings of Fact – SAPCR

 

          4.       At
the time of the rendition of the Final Order, Petitioner Stephen Hall was
seeking custody of the following child under the age of eighteen years:

 

                   Name: 
[C.M.B.]

                   Sex: 
MALE

                   Birth
date: 06/08/2002

 

          5.       It
is in the best interest of the child that Stephen Hall be appointed the Sole
Managing Conservator of the child, with all the rights and duties of a Non
Parent Appointed as Sole Managing Conservator as set out in Family Code Section
153.371, which Section is incorporated by reference as if fully set forth
herein.

 

          6.       There
is credible evidence of a history or pattern of past or present child neglect
or physical abuse or drug abuse by [Mother] directed against the Minor Child,
or done while in possession of the Minor Child and it is not in the best
interest of the Minor Child that [Mother] be appointed as Sole or Joint
Managing Conservator of the Minor Child.

 

          7.       There
is credible evidence of a history or pattern of past or present child neglect
or physical abuse or drug abuse by [Father] directed against the Minor Child, or
done while in the possession of the Minor Child and it is not in the best
interest of the Minor Child that [Father] be appointed as Sole or Joint
Managing Conservator of the Minor Child.

 

Findings of Fact – Possession

 

          8.       The
periods of possession vary from the Standard Possession Order for the following
reasons:  The Minor Child is a Special Needs Child and has severe emotional and
behavior issues.  The Minor Child requires constant care, assistance with
administering his medication and help with educational challenges.  Through
testimony and other evidence Petitioner has proven himself to be the consummate
caregiver and the Minor Child has flourished under his tutelage.  The
established rapport that Petitioner has with the Minor Child and the past history
of neglect/abuse by [Mother] mandate limited access by [Mother].  The Minor
Child is agitated when forced to communicate with [Mother] and the Minor Child
is more emotional and behavior challenged when he returns from visitation with
[Mother].  Similarly, the past history of extended periods of absence by
[Father] created an irreconcilable gap in his relationship with the Minor Child
and the Minor Child is having more difficulty returning to his structure at
home after visitation with [Father].  The Minor Child will benefit from limited
and structured exposure to [Father].

 

Findings of Fact – Grandparent
Possession of or Access to Grandchild

 

          9.       At
the time of the filing of this request for possession of or access to [C.M.B.],
[Father] has not had his parental rights terminated.

 

          10.     Denial
of possession or access to the child by his Paternal Grandmother would
significantly impair the child’s physical health or emotional well-being.

 

Findings of Fact – Child
Support

 

          11.     The
amount of child support ordered by the Court is in accordance with the
percentage guidelines:

 

          12.     The
amount of child support payments per month that is computed if the percentage
guidelines of section 154.125 of the Texas Family Code are applied to the first
$7,500 of [Mother]’s net resources is $222.56; and

 

          13.     The
amount of child support payments per month that is computed if the percentage
guidelines of section 154.125 of the Texas Family Code are applied to the first
$7,500 of [Father]’s net resources is $222.56;

 

Appointment of Non
Parent as Sole Managing Conservator

 

          14.     The
Court finds by a preponderance of evidence and by clear and convincing evidence
that (a) the appointment of [Father] would not be in the best interest of the
Minor Child because such appointment would significantly impair the health and
emotional development of the Minor Child[, and] (b) the appointment of [Mother]
would not be in the best interest of the Minor Child because such appointment
would significantly impair the health and emotional development of the Minor
Child[.]

 

Findings of Fact as
Conclusions of Law    

 

          15.     Any
finding of fact that is a conclusion of law shall be deemed a conclusion of
law. 

 

          On
appeal, Father challenges only findings of fact number 7, 8, and 14. However,
Father did not challenge the remaining findings of fact, including finding of
fact number 5, which found that it was in C.M.B.’s best interest that Hall be
appointed as the sole managing conservator of C.M.B.  Nor did Father establish
the contrary as a matter of law; instead, the testimony at trial bore out this
finding of fact.  Consequently, this finding of fact is binding on this court
and supports the trial court’s judgment.  See
McGalliard v. Kuhlmann,
722 S.W.2d 694, 696 (Tex. 1986); Rischon Dev. Corp., 242 S.W.3d at 166;
In re X.V., No. 02-09-00227-CV, 2010 WL 3193168, at *11 (Tex. App.—Fort
Worth Aug. 12, 2010, no pet.) (mem. op.) (holding that unchallenged findings of
fact that were supported by trial testimony were binding on appellate court).

          Moreover,
Hall presented evidence that Mother had requested numerous visits with C.M.B.
since 2006 when Murphy filed suit to obtain custody; there was no similar
evidence regarding any requests from Father to visit with C.M.B.  In fact, the
record seems to indicate that it was Bisbey, C.M.B.’s grandmother, who
requested the visits once a month or every other month and who established a working
relationship with Hall and that Father visited with C.M.B. only as a byproduct
of Bisbey’s requested visits.  The record lacked evidence that Father had attended
meetings at the school to assist with C.M.B.’s special needs, nor did the
record contain evidence that Father had taken C.M.B. to any of his appointments
with his psychologist.  Hall presented evidence that Father paid no child
support during the years C.M.B. was in Hall’s custody, and there was no
evidence that Father supported C.M.B. in any other way, such as by providing
medical care, school supplies, food, clothing, or birthday or Christmas
presents.  The evidence also demonstrated that Father did not have any income,
that he did not have a place of his own, and that he did not have the tools to
“really provide and attend to [C.M.B.’s] special needs concerns.”  Father’s
future plans, as explained by Bisbey, were speculative and were contingent on
Father’s ability to obtain employment.

Father
did not testify at the conservatorship hearing.  The limited controverting
evidence that came in via Hall’s friend, who had met Father in person only
twice, established that C.M.B. did “quite well” with Father, that Father was a
caring person, that C.M.B.’s physical safety was not in jeopardy when he
visited with Father, and that C.M.B. appeared to have had a pleasant experience
when he returned from visits at Bisbey’s house where Father lived.  However,
Bisbey, who would have been able to observe any interaction between Father and
C.M.B. while he was visiting at Bisbey’s house, did not provide any testimony
regarding if or how the two interacted.

The
record here demonstrated that appointing Father as managing conservator of
C.M.B.—which would require C.M.B. to move and to live with a man whom he
visited only once a month or every couple of months and who had shown no
ability to pay for or to tend to C.M.B.’s special needs—would significantly
impair his emotional development due to Father’s extended periods of absence
from C.M.B.’s life from the time he was one until he was seven.  See X.V.,
2010 WL 3193168, at *12 (holding that it was within trial court’s discretion to
find that appointing mother as the child’s managing conservator would
significantly impair his physical and emotional development because record
disclosed, among other facts, that mother could not financially support son,
that she was looking for full-time employment, that she was still working on
her home, and that it was best for son to remain in situation where he was
thriving); Lopez v. Dep’t of Family & Protective Servs., No.
01-08-00111-CV, 2008 WL 4367588, at *7–8 (Tex. App.—Houston [1st Dist.] Sept. 25,
2008, pet. denied) (mem. op.) (holding that it was within trial court’s
discretion to find that appointing father as the children’s managing
conservator would significantly impair their physical and emotional development
because record disclosed, among other facts, that father was unable to maintain
stable employment and housing).  Because sufficient evidence exists that
appointing Father as managing conservator of C.M.B. would significantly impair C.M.B.’s
emotional development, we therefore hold that the trial court did not abuse its
discretion by concluding that Hall had overcome the parental presumption by
proving that appointing Father as C.M.B.’s managing conservator would cause C.M.B.
significant impairment by a preponderance of credible evidence.  See
Whitworth, 222 S.W.3d at 623; In re Rodriguez, 940 S.W.2d 265, 272 (Tex.
App.—San Antonio 1997, pet. denied) (affirming appointment of nonparent as the
managing conservator of the child when child had lived with nonparents since
day after her birth, had visited only twice with father, had bonded with
nonparents, and had received cards addressed by and presents bought by paternal
grandmother; suggesting that significant impairment of emotional development
may be inferred from uprooting a child or from placement with parent who has a
poor track record for stability and continuity); In re Hidalgo, 938
S.W.2d 492, 497 (Tex. App.—Texarkana 1996, no writ) (holding that evidence
supported conclusion that appointment of mother as sole managing conservator
would significantly impair the emotional development of the child since she had
effectively abandoned the child from shortly after birth until she was eleven);
X.V., 2010 WL 3193168, at *12; Heiskell v. Kendrick, No.
14-06-00972-CV, 2007 WL 3072002, at *4 (Tex. App.––Houston [14th Dist.] Oct.
23, 2007, no pet.) (mem. op.) (holding that sufficient evidence existed to show
that father’s appointment as managing conservator would significantly impair
the children’s physical health or emotional development because father had
physically attacked mother on a number of occasions, had made only sporadic
visits to the children following separation from mother, and had failed to
provide adequate financial support for children).  Father’s arguments on appeal
that Hall had relied on others to do his parenting, that Hall did not have
consistent parenting help, and that Father could provide a nice home for C.M.B.
fall short—especially in light of his failure to testify as to his relationship
with and plans for caring for C.M.B.—and do not controvert the fact that Hall had
overcome the parental presumption by a preponderance of credible evidence.  We therefore
overrule Father’s first issue. 

IV.  Possession
and Access Order Was Supported By Record

          In
his second issue, Father argues that the trial court abused its discretion by
giving Mother more visitation than Father and by denying Father any visitation
with C.M.B. on Christmas Eve or Christmas Day. 

The
public policy of this State is to assure continuing contact between children
and parents who have established the ability to act in their child=s
best interest; to provide a safe, stable, and nonviolent environment for the
child; and to encourage parents to share in their child=s
development after separation or divorce.  Tex. Fam. Code Ann. ' 153.001
(Vernon 2008).  When determining issues related to conservatorship or
possession of and access to the child, the best interest of the child is the
primary consideration.  Id. '
153.002; In re M.S., 115 S.W.3d 534, 547 (Tex. 2003).

The
Texas Family Code provides guidelines for trial judges to follow when
determining the periods of possession for a possessory conservator.  Tex. Fam.
Code Ann. ' 153.192(b) (Vernon 2008).  The
Texas Family Code also provides that there is a rebuttable presumption that the
standard possession order (1) provides reasonable minimum possession of a
child for a parent named as a possessory conservator or joint managing
conservator and (2) is in the best interest of the child.  Id. '
153.252.  However, the Texas Family Code allows a trial court to deviate from
the standard possession order.  When deviating from the standard possession
order, a trial court may consider (1) the age, developmental status,
circumstances, needs, and best interest of the child; (2) the circumstances
of the managing conservator and of the parent named possessory conservator; and
(3) any other relevant factor.  Id. '
153.256.

As
mentioned above, in determining the issues of conservatorship and possession of
and access to the child, the trial court is given wide latitude in determining
the best interest of the child and will be reversed only for an abuse of
discretion.  In re C.R.T., 61 S.W.3d 62, 65 (Tex. App.CAmarillo
2001, pet. denied) (citing Gillespie, 644 S.W.2d at 451).  This is, in
part, because the trial court is in a better position having Afaced
the parties and their witnesses, observed their demeanor, and had the
opportunity to evaluate the claims made by each parent.@  Coleman
v. Coleman, 109 S.W.3d 108, 111 (Tex. App.CAustin
2003, no pet.).  Thus, when the testimony of witnesses is conflicting, this
court will not disturb the credibility determinations made by the factfinder.  See
id.  A reviewing court=s holding that a trial court
did not abuse its discretion implies that the evidence contained in the record
rebutted the presumption that the standard possession order was reasonable and
in the child=s best interest.  See Niskar v.
Niskar, 136 S.W.3d 749, 756 (Tex. App.CDallas
2004, no pet.).

With
regard to the age, developmental status, circumstances, needs, and best
interest of the child, the trial court specifically found—as set forth above in
finding of fact number 8—that the standard possession order was not reasonable
and not in the seven-year-old child=s
best interest for the following reasons:  “The Minor Child is a Special Needs
Child and has severe emotional and behavior issues.  The Minor Child requires
constant care, assistance with administering his medication and help with
educational challenges.”  

With
regard to the circumstances of the managing conservator and of the parent named
possessory conservator, the trial court had before it evidence that Hall had a
job with a steady income and a nice home and that he provided for all of
C.M.B.’s needs.  Hall was involved and worked to understand how to handle
C.M.B.’s behavioral problems and what his educational process requires.  The
trial court also had before it evidence that Father was unemployed, that Father
had not made any child support payments to Hall, and that Father had not
actively and regularly participated in C.M.B.’s life from the time C.M.B. was a
little over a year old until he was seven.  There was no evidence regarding how
many visits Father had with C.M.B. after suit was filed in 2007.  

Based
on the record, the trial court was in the best position to weigh Mother’s
demonstrated interest in initiating visits and her potentially volatile
environment against Father’s nice home but lack of visits and time spent with
C.M.B.  The trial court was also in the best position to determine whether a
Christmas Eve or Christmas Day visit was warranted in light of the fact that
only Bisbey—not Father—had provided money once for a Christmas gift for C.M.B. 
Accordingly, we hold that the trial court did not abuse its discretion by
entering a modified possession and access order that was in C.M.B.’s best
interest.  See In re T.J.S., 71 S.W.3d 452, 459–60 (Tex. App.—Waco 2002,
pet. denied) (holding that evidence supported variance from standard possession
order because, among other facts, eighteen-year-old father who lived with his
parents had not seen child since birth, had not asked to see the child, and had
not provided financial support nor gifts for child); see also Elmakiss v.
Elmakiss, No. 12-06-00405-CV, 2008 WL 2358221, at *9–12 (Tex. App.—Tyler
June 11, 2008, no pet.) (mem. op.) (holding that trial court did not abuse its
discretion by ordering terms of possession that differed from standard
possession order because, among other facts, father lacked employment and
demonstrated a lack of awareness of child’s developmental status or needs).  We
therefore overrule Father’s second issue.

V.  Conclusion

          Having
overruled Father’s two issues, we affirm the trial court’s judgment.

 

SUE WALKER
JUSTICE

 

PANEL: 
GARDNER,
WALKER, and MCCOY, JJ.

 

DELIVERED:  April 21, 2011









[1]See Tex. R. App. P. 47.4.





[2]Although Father was at the
hospital when C.M.C. was born, the birth certificate did not reflect Father’s
name.  C.M.C.’s name was legally changed to C.M.B. to reflect that Father was
his biological father.  We will therefore use “C.M.B.” when referencing the
child in the remainder of this opinion.





[3]The record does not detail
the cause of Murphy’s death.





[4]Hall testified that he
lives in a house that was built in 2000, that he was employed as a field
engineer superintendent and was required to travel some, and that his salary
was $60,000 a year.





[5]Mother also admitted that
she had two DWI convictions and had lost her license for two years in 2002.





[6]Mother testified that she
had three children, including C.M.B.  Mother’s oldest child is an adult, and
her middle child lives with her dad.  So C.M.B. would be the only child living
in her home.





[7]Photos of her home,
including photos of her stocked pantry and refrigerator, were admitted into
evidence.





[8]The trial court also
ordered Mother and Father to pay child support, to repay medical reimbursement
arrearages, and to provide medical support for C.M.B., but those portions of
the order are not detailed above because they are not challenged on appeal.